HOWARD G. BROWN AND ELOISE S. BROWN, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Brown v. Commissioner
Docket Nos. 15826-86, 28010-86, 6134-87, 6518-87, 6586-87, 7680-87, 9855-88, 9856-88, 22027-88
United States Tax Court
T.C. Memo 1992-379; 1992 Tax Ct. Memo LEXIS 402; 64 T.C.M. (CCH) 20; T.C.M. (RIA) 92379; July 7, 1992, Filed *402 Appropriate orders will be issued in each case. For Petitioners: Mark Clement. For Respondent: Michael A. Yost and Donna J. Pankowski. DAWSON
DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: These consolidated cases were assigned to Special Trial Judge D. Irvin Couvillion pursuant to section 7443A(b)(4) and Rules 180, 181, and 183. [2] The Court agrees with and adopts the opinion of the Special Trial Judge which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE COUVILLION, Special Trial Judge: These cases have been identified by respondent as part of a national litigation project known as "Farley Horses". Trial of these cases was limited to those issues which the parties agreed related to Farley Horses. Some cases have unrelated issues which were not heard or considered in this proceeding. Respondent determined Federal income *403 tax deficiencies, additions to tax and increased interest [3] against petitioners as follows: Additions to Tax
Sec.
Sec.
Sec.
Names
Docket No.
Year
Deficiency
6653(a)(1) [1]
6659
6661
Harold G. &
15826-86
1982
$ 9,024.00
--    $ 1,309.00
$ 466.00
Eloise S.
22027-88
1983
23,518.00
--    601.00
5,379.00
Brown
1985
2,025.00
--    --   --   1986
15,123.00
--    --   --   Thomas C. &
28010-86
1980
$ 44,144.85
--    --   --   Frances D.
1981
26,890.66
--    $ 6,140.53
--   Konenkamp
1982
17,499.07
--    3,559.32
$ 563.47
9856-88
1983
9,708.00
--    --   2,427.00
Donald J. &
6134-87
1980
$ 14,654.00
$ 733.00
--   --   Bonnie M.
1981
5,182.00
[2] 259.00
1,317.00
--   Tripi
Richard E. &
6518-87
1980
$ 36,468.00
--    --   --   Nancy B.
1981
35,008.00
--    $ 6,502.00
--   Doyle
1982
32,762.00
--    4,653.00
$ 4,312.50
9855-88
1983
4,601.00
--    --   --   Ronald J. &
6586-87
1980
$ 10,815.35
$ 540.77
--   --  Lillian T.
1981
34,801.10
[3] 1,740.06
$ 8,523.16
--  Kims
1982
7,718.77
--    1,348.02
$ 806.35
S. Byrne &
7680-87
1980
$ 34,078.00
--    --   --   Barbara S.
1981
16,538.00
--    $ 3,890.10
--   Doyle
1982
17,025.00
--    2,581.80
$ 2,104.75
*404 The issues for decision are: (1) Whether petitioners are entitled to deductions and losses arising out of their investments in various standardbred horse programs; and (2) whether petitioners are liable for additions to tax noted above and the increased interest rate under section 6621(c) for underpayments of tax attributable to tax-motivated transactions. These cases involve investments in standardbred horses. More specifically, respondent determined that petitioners' claimed deductions and losses from various standardbred programs were not allowable for a variety of reasons: (1) The alleged events, transactions, and expenditures did not occur in fact or in substance; (2) the programs were not entered *405 into for profit, were not trades or businesses, and were not conducted for the production of income; (3) the programs had no economic substance and were shams set up to create artificial deductions and losses; (4) the entities, partnerships, or subchapter S corporations, out of which the deductions and losses flowed, were not the actual owners of and never acquired depreciable interests in horses and other assets subject to depreciation; (5) the horses and other assets of the various programs subject to depreciation were not placed in service in the years claimed; (6) the adjusted basis, salvage value, useful life, and the method of depreciation of horses and other assets in the programs were improper; (7) the claimed losses exceeded the amounts at risk under section 465; (8) the notes, obligations, and other financing instruments executed in connection with investments were not bona fide indebtedness; and (9) certain expenses claimed were not in fact incurred. Alternatively, if such expenses were incurred, the expenses were not ordinary and necessary trade or business expenses. [4]
*406 FINDINGS OF FACT Some of the facts were stipulated, and such facts are found accordingly. At the time the petitions were filed, all petitioners resided in the State of Pennsylvania. Introduction
The investments in these cases involve transactions between petitioners, as investors, and an individual, Daniel J. Farley (Mr. Farley), and/or one or more closely held corporations controlled by Mr. Farley as promoter and manager of the programs. Background
Daniel J. Farley
During the years at issue and prior thereto, Mr. Farley operated a tax return preparation service, Daniel J. Farley, Tax Consultant, at Bethel Park, Pennsylvania. Mr. Farley has a degree in accounting and several graduate courses in taxation but is not a certified public accountant. Mr. Farley and his employees prepared the returns of all petitioners in these cases except Ronald J. and Lillian T. Kims. In 1985, Mr. Farley changed the name of his tax return preparation service to Robin Hood Tax Services, Inc. In 1981, respondent commenced civil audits of various horse investment programs promoted by Mr. Farley, and, in April 1983, Mr. Farley became aware that a criminal investigation of his preparation *407 of Federal tax returns for certain investors in standardbred programs was underway. In 1988, Mr. Farley entered pleas of guilty to three counts of violation of section 7206(2). Although the counts to which Mr. Farley pleaded guilty did not directly involve petitioners in these cases, from 1983 until his conviction in early 1988, defense of the criminal case and civil audits of the horse programs required a significant amount of Mr. Farley's time, money, and attention, a factor which petitioners contend adversely affected the management of Mr. Farley's horse farm and, consequently, management of the standardbred programs in which petitioners and others had invested. Additionally, records of Farley companies relating to horse investment programs in which some petitioners had invested were subpoenaed by the Federal grand jury in 1984, and these records remained in the custody of the U.S. attorney until 1988. Petitioners suggest that certain documents, including an original nonrecourse promissory note, may have been lost while the documents were in the Government's control. The Standardbred Horse Industry
Standardbred horses are bred and trained for harness racing and compete *408 either as pacers or trotters. In the case of a pacer, the legs of the horse on one side move together. In the case of a trotter, one front leg and the opposite rear leg of the horse advance at the same time. The trotting gait is harder to maintain than the pacing gait and requires more training. Pacers are generally slightly faster than trotters. For that reason, pacers and trotters do not run in the same race. The record is unclear as to which type of race enjoys more popularity nor does the record indicate whether the value of a standardbred is affected by whether it is a pacer or a trotter. The investment programs in these cases do not appear to be based upon whether the horses were pacers or trotters. In standardbred racing, the horses run in harness and pull a driver in a two-wheeled cart called a sulky. Bets are placed on races through parimutuel machines. Beginning in the late 1970s, the popularity of harness racing as a spectator sport increased substantially, particularly in the northeastern United States. Additional facilities and horses were required to meet public demand for the sport. For example, the Meadowlands Racetrack, a premier facility, was constructed *409 in New Jersey, and a million-dollar race for 2-year-old pacing colts and fillies known as the Woodrow Wilson Pace has been held there annually since 1978. As the industry grew in popularity, the number of standardbreds foaled each year increased and the average sales prices for yearlings and other standardbreds escalated. By 1984, however, the market became saturated and average standardbred prices declined for the remainder of the decade. The United States Trotting Association (USTA) establishes rules regulating the registration of standardbred horses and the conduct of harness racing. To qualify to race in the United States, a standardbred must be owned by a member of and registered with the USTA, and all standardbred breeding stock intended to produce offspring qualified to race must likewise be registered with the USTA. The USTA is the sole organization maintaining registration records of standardbred horses in the United States. Upon application and payment of a fee, USTA issues a registration certificate identifying the horse, the breeder, and the registered owner. Registration certificates are regarded in the industry as ownership documents, analogous to automobile titles. *410 Under USTA rules, all individuals having a beneficial interest in excess of 5 percent of a standardbred must be identified in USTA records as an owner of the horse. In addition, USTA rules provide for registration of stable, farm, partnerships, or corporations as standardbred owners. Disclosure of the identities of all owners of an entity is required and appointment of one or more persons to act as corresponding officer for purpose of signing documents on behalf of an entity is permitted. USTA rules require that all transfers of ownership of a standardbred be immediately reported to the USTA. Reported transfers are then entered in USTA records and reflected on a reissued registration certificate. Security interests are also recorded in the records of the USTA and reflected on registration certificates. Additionally, a creditor holding a security interest on a standardbred usually maintains possession of the horse's registration certificate and requests that the USTA not issue a duplicate registration certificate until notified that the debt secured by the horse has been paid and the security interest released. Typical financing arrangements in the industry for standardbreds *411 commonly extend no longer than 3 years. A standardbred is considered a yearling on January 1 of the year following its birth, regardless of its actual date of birth. The life span of a standardbred is about 25 years, and the maximum breeding span approximately 20 years. The preferred foaling season in the industry is February through June. Mares generally bear 1 foal per year (the gestation period being 11 months), and a stallion is capable of breeding from 75 to 225 mares during a breeding season. Embryo transfers from 1 mare to another are not permitted under USTA rules; however, artificial insemination has been commonly used as the preferred breeding technique for approximately 50 years. The owner of a mare pays a stud fee to the stallion owner upon the birth of a live foal. The owner of the mare is considered owner of the newborn foal. The stud fee for a foal must be paid before the foal can be registered with the USTA. Standardbred horses are sold at yearling and mixed auction sales, the latter being a sale of horses of varying ages. Major yearling sales are held beginning in August and continue through November each year. A horse which is sold at a yearling sale foaled *412 sometime in the year preceding the sale. Training of a standardbred commences at the end of its yearling year and lasts 6 to 9 months. A standardbred is eligible for racing at 2 years of age but only a small percentage of horses race as 2-year-olds. A greater percentage race as 3- or 4-year-olds, after further physical maturity and additional training. A standardbred is permitted to race until age 12 but most race careers are less than 5 years. In general, less than one-half of all standardbreds race. Standardbreds may be leased for racing purposes; however, leases are required to be reported to the USTA. Racetracks for standardbred racing also must be members of the USTA and conform to USTA rules. The USTA maintains and provides information to member racetracks regarding a standardbred's qualification by issuing an eligibility certificate for the horse. An eligibility certificate includes ownership and identification information contained in the horse's registration certificate, the names of any lessees for racing purposes, the horse's best race time, money winnings, and a detailed chart line of its last eight racing starts. This information is necessary to ensure accuracy *413 for parimutuel betting and also to determine the horse's eligibility for various classes of races. Among the classes of standardbred races are "claiming" races and "stakes" races. In a claiming race, all horses in the race are eligible to be claimed for purchase by other owners of horses in the race for a price set in advance by the owners. For example, a horse entered in a claiming race for $ 4,000 can be claimed by another owner at the conclusion of the race for the price of $ 4,000. The traditional races are the stakes races in which the horses compete for purses. The size of the purse depends upon the classification of the track. At the more elite racetracks, horses are nominated well in advance of the race and require payment of a nominating fee, various periodic sustaining fees, and a starting fee, all of which are nonrefundable. Because of these expenses, only the best and fastest horses are nominated for stakes races. These races, however, pay the largest purses and attract the most public attention. Other classes of races are "overnight" and "county fair" races in which the participating horses are entered within a few days of the race. Nominating and sustaining *414 fees are not required for these types of races. Racetracks are classified as either A, B, or C tracks, based upon the size of the purse awarded the winning horses. Examples of A tracks include the Meadowlands in New Jersey, Yonkers Raceway in New York, Roosevelt Raceway in New York, Sportsman's Park in Chicago, and the Jockey Club in Toronto, Canada. The minimum purse at these tracks is $ 5,000, divided between the winner and the next four horses. Purses of less than $ 5,000 are paid by the class B tracks, which include the Meadows in Washington, Pennsylvania, Pompano Beach in Florida, and Brandywine. [5] Class C tracks usually pay a purse of $ 500 to $ 700 and include county fair races and other races outside the established racetracks. The Grand Circuit is at the top of the class in standardbred racing and is, in fact, a circuit in which a sequence of stakes races are held at various tracks over the racing season. The horses in the Grand Circuit *415 are considered the best, and it is generally considered that only 3 percent to 5 percent of standardbreds in training have the potential to compete in the Grand Circuit. The expenses in providing and training horses for stakes races are extremely high. In addition to nonrefundable nominating, sustaining, and entry fees, the trainers for such horses are better paid. Insurance, transportation, and security costs are higher. It is not uncommon for the expenses of a successful stakes winning horse to exceed its winnings. However, a successful stakes racing career enhances the value of a horse for breeding purposes. Arden Hill Farms, Inc.
In 1973, Mr. Farley met Robert L. Harper (Mr. Harper), a trainer of American saddlebred horses. Unlike standardbred horses, saddlebreds are generally utilized for riding and show purposes and do not race. Mr. Farley and Mr. Harper purchased, trained, and sold saddlebred horses between 1973 and 1976. Mr. Farley had little prior experience with horses but Mr. Harper had been involved with saddlebreds most of his life. In 1976, Mr. Farley and Mr. Harper organized Arden Hill Farms, Inc. (Arden Hill Farms), and purchased a 130-acre farm near *416 Washington, Pennsylvania, for use in their horse business. During the years at issue, Mr. Harper was president of Arden Hill Farms, and Mr. Farley was secretary. Each owned 50 percent of the stock of Arden Hill Farms. Initially, Arden Hill Farms trained and sold only saddlebred horses. Approximately a year after its formation, Arden Hill Farms began acquiring standardbred horses for racing and breeding. At that time, neither Mr. Harper nor Mr. Farley had extensive experience with standardbred training, racing, or breeding. Arden Hill Farms originally owned many of the horses sold to petitioners and managed the horses and broodmares during the years at issue. The Farley Companies
In addition to Arden Hill Farms, three other corporate entities controlled by Mr. Farley were involved in the standardbred programs in these cases: Daniel J. Farley, Inc., Meadowlands Marketing and Management Company, Inc. (Meadowlands Marketing or MMMI), and Farley & Farley, Inc. Mr. Farley was the sole officer of each of these corporations. He owned 100 percent of the stock of Daniel J. Farley, Inc., and 60 percent of the stock of Meadowlands Marketing and Farley & Farley, Inc. His brother *417 George Farley owned the remaining 40 percent of the stock of the latter two corporations but was not involved in their management. For convenience, these corporations are hereafter at times referred to as the Farley companies. The Farley companies were used in one fashion or another in the standardbred programs in these cases and were payees on the investors' promissory notes. Mr. Farley at times treated the various Farley companies and Arden Hill Farms as interchangeable entities. This was particularly the case when cash-flow became a problem. Petitioners
Howard G. Brown and Eloise S. Brown
Howard G. Brown is a college graduate who, at time of trial, was employed as an account manager overseeing large commercial loans for Westinghouse Credit Corp. Eloise S. Brown, his wife, became a real estate salesperson in 1977 or 1978. Anticipating additional income from Mrs. Brown's new occupation, the Browns consulted Mr. Farley for tax advice. Mr. Farley had been recommended by other real estate agents. In his discussions with the Browns, Mr. Farley apprised them of the standardbred programs he was promoting. Seeking to offset Mrs. Brown's potential real estate sales income *418 through expected losses on the horse programs, the Browns decided to invest in four of the Farley standardbred programs. Mr. Brown, who testified at trial, was actively involved in decision-making concerning the Browns' standardbred investments but, consistent with their goal of offsetting Mrs. Brown's income, ownership of the various horse programs was arranged in Mrs. Brown's name alone, and she signed most of the documents. Neither of the Browns had any experience with horses or investments in horses prior to their involvement in the Farley standardbred programs. Mr. Brown relied primarily on Mr. Farley for information about standardbreds. The Browns' Farley horse investments included interests in individual standardbred horses named Real Dream and Robena Lobell, acquired in 1978; Hilarious Lori, acquired in 1980; interests in corporations and a partnership which owned standardbreds, Bethel Standardbreds, Inc., acquired in 1981; Albatrick, Inc., acquired in 1983; and Shane T. Hanover Associates, acquired in 1985 in exchange for the interest in Albatrick, Inc. Donald J. Tripi and Bonnie M. Tripi
Donald J. Tripi has a bachelor's degree in business and received a master's *419 degree in business administration from Kent State University in 1962. At the time of trial, he was district sales manager for the Arnold Corporation, a firm engaged in the manufacture and distribution of business forms. The record does not reveal the extent of Mrs. Tripi's involvement in the standardbred programs, if any. Mr. Tripi became acquainted with Mr. Farley in 1976 or 1977, when he selected Mr. Farley to prepare his tax returns. Eventually, he was informed of Mr. Farley's standardbred programs and initially purchased an interest in an individual standardbred, Brilliant Wave, and then invested in the Arden Hill Racing & Breeding Program 1980-1. Prior to his investment in the Farley horse programs, Mr. Tripi's only experience in standardbreds was ownership with a friend and business associate in Cleveland, Ohio, of a standardbred racehorse named Surfing Lady, a venture that was not profitable. Mr. Farley was not involved in that investment. Mr. Tripi's partner in Surfing Lady had more experience with standardbred horses, although it is not clear from the record the extent of his partner's expertise in the industry. Mr. Tripi discussed the Farley horse programs with his *420 friend before investing in them but made no other investigation of the Farley programs. S. Byrne Doyle and Barbara S. Doyle
In 1980, S. Byrne Doyle (Byrne Doyle) was employed as senior vice president in charge of construction projects nationwide for Schneider, Inc., a construction firm engaged in mechanical powerplant work. He holds a teaching certificate for construction trades from the University of Purdue. [6] He began his career as a pipefitter and chose Mr. Farley as his tax return preparer on the recommendation of others in the construction trades. The record does not reveal the extent of Barbara Doyle's involvement with the standardbred programs, if any. Byrne Doyle had no experience with horses prior to investing in the Farley standardbred programs and relied primarily on Mr. Farley for information about the industry. He also discussed investing *421 in standardbreds with Frank Schneider, chairman of the board of his employer. Byrne Doyle also discussed the Farley programs with two other petitioners, his brother, Richard E. Doyle, and Thomas C. Konenkamp, both of whom were also employed by Schneider, Inc., in the early 1980s. Other than these discussions, Byrne Doyle conducted no investigation of the Farley standardbred programs prior to investing. Byrne Doyle's investments in Farley horse programs included interests in the horses Robena Lobell, Sportscaster, Majicobb, Lady Linda Bret, Arden Hill Racing & Breeding Program 1980-1, and Shane T. Hanover Associates. Richard E. Doyle and Nancy B. Doyle
Richard E. Doyle (Richard Doyle) is a construction manager for Schneider, Inc., and completed a 5-year apprenticeship program in pipefitting. He became acquainted with Mr. Farley as a tax return preparer through other construction workers in the mid-1970s. The record does not reveal the extent of Nancy Doyle's involvement in the standardbred programs, if any. Richard Doyle's preinvestment investigation was similar to that of his brother Byrne Doyle. Richard Doyle's investments in Farley standardbred programs included the *422 horses Bye Bye Skipa, Sportscaster, Frosty Move, Shane T. Hanover Associates, and Arden Hill Racing & Breeding Program 1980-1. Thomas C. Konenkamp and Frances D. Konenkamp
In 1980, Thomas C. Konenkamp was employed as a steamfitter by Schneider, Inc. He has 1 year of college education and 5 years as a steamfitter apprentice. He became aware of Mr. Farley as a tax return preparer through other steamfitters. The record does not reveal the extent of Frances D. Konenkamp's involvement in the standardbred programs, if any. Mr. Konenkamp consulted only with Mr. Farley before investing in the Farley standardbred programs. His Farley horse investments included Sportscaster, Meadow Michael, Lady Linda Bret, Keystone Standardbreds, Inc., and Arden Hill Racing & Breeding Program 1980-1. The interest in Meadow Michael was contributed in 1979 to Konenkamp Stables, Inc., a small business corporation (S corporation) wholly owned by Mr. Konenkamp until the sale of his stock in the corporation to Arden Hill Farms in 1981. Ronald J. Kims and Lillian T. Kims
Ronald J. Kims owned a janitorial service business from which he retired in 1985. He met Mr. Farley at a Christmas party *423 in December 1979 and talked with him briefly about Arden Hill Farms. Subsequently, he received information from Mr. Farley concerning the Arden Hill Farms Breeding Program. Mr. Farley was not the tax return preparer for Mr. and Mrs. Kims. The record does not reveal the extent of Lillian Kims' involvement in the standardbred program, if any. Before investing, Mr. Kims consulted a friend, Otto Kessler, M.D., who was engaged in racing standardbred horses at the Meadows. The record is not clear as to the extent of Dr. Kessler's expertise in the industry. Mr. Kims also discussed the investment with his accountant and his former business partner, neither of whom was experienced in standardbred breeding but whose business acumen he respected. Mr. Kims' Farley Horse investments included a partnership interest in the Arden Hill Farm Standardbred Breeding Program acquired in 1980. The Farley Standardbred Programs
Sportscaster
Sportscaster was a standardbred horse originally purchased by Arden Hill Farms on Mr. Harper's recommendation and was syndicated shortly thereafter to investors who included petitioners Konenkamp, Richard Doyle and Byrne Doyle. Although this horse is *424 not one of the standardbred programs at issue in these cases, petitioners cited this horse's running in the August 6, 1980, Woodrow Wilson Pace (a prestigious, million-dollar, Grand Circuit race) as one of the reasons they had confidence in Mr. Farley and invested in his standardbred programs. However, it should be noted that petitioners' investments in the Arden Hill Farms Breeding Program and Arden Hill Racing & Breeding Program 1980-1 predated the 1980 Woodrow Wilson race. None of the investors in Sportscaster showed a profit from their investment in this horse. Arden Hill Racing and Breeding Program 1980-1
This program was offered to investors in a private placement memorandum dated May 12, 1980, and consisted of seven 2-year-old standardbred fillies owned by Meadowlands Marketing. It was anticipated that the fillies would race for about 2 years, then would be used as broodmares. Some of their foals would be retained for future racing and breeding. The expectation was that the total number of horses in the program, referred to as the "herd", would ultimately reach 30. The syndication consisted of 35 units, with each unit representing a 1/35 interest in seven horses. *425 Each investor purchased a unit or units directly from Meadowlands Marketing and, upon the sale of all units, the interests were contributed to a limited partnership, Arden Hill Racing & Breeding Program 1980-1. For brevity's sake, this program is hereafter referred to as the Racing and Breeding Program. Each investor was a limited partner. The limited partners were allocated 98 percent of the profits and losses of the partnership. The general partner was an individual named Roland M. Jermyn, Jr., who had no prior experience in horse racing or breeding. The general partner made no capital contribution to the partnership and was allocated 2 percent of the partnership's profits and losses. The investment for each unit in this program was $ 77,000, payable $ 28,000 cash over a 3-year period and execution of a $ 49,000 promissory note. Portions of the cash were payable to the partnership as capital contributions and portions of the cash were payable to Meadowlands Marketing as a down payment for the horses and payments of interest on the $ 49,000 note. The $ 49,000 note was payable to Meadowlands Marketing. The $ 77,000 investment for each interest was as follows: Cash Payments:  Payable To
Installment
Due Date
Meadowlands Marketing
$ 10,000  at subscription
$  1,000 cash downpayment
for horses
2,757
advance interest
on $ 49,000 note
10,000
1/15/81
4,410
interest on
$ 49,000 note
4,000
1/15/82
4,000
interest on
$ 49,000
4,000
1/15/83
4,000
interest on
$ 49,000
Total $ 28,000
$ 16,167
*426 Payable To
Installment
Partnership
$ 10,000
$ 6,243 capital contribution
10,000
5,590 capital contribution
4,000
- 0 -
4,000
- 0 -
Total $ 28,000
$ 11,833
Promissory Note: To Meadowlands
To
Amount
Date Executed
Marketing
Partnership
$ 49,000
at subscription
$ 49,000
- 0 -
Total Investment:
Per Unit:
To Meadowlands
To
Cash and Note Amount
Marketing
Partnership
$ 77,000 $ 65,167
$ 11,833
For 35 Units:
$ 2,695,000 $ 2,280,845
$ 414,155
The $ 2,280,845 to be ultimately paid to Meadowlands Marketing included $ 530,845 interest on the $ 49,000 notes of the investors. Thus, the selling price for the seven horses was $ 1,750,000 ($ 2,280,845 less $ 530,845). In the private placement memorandum, it was disclosed that the cost price to Meadowlands Marketing of the seven horses, acquired in 1978 and 1979, was $ 150,000. No disclosures were made as to the cost and selling price of each individual horse. Each $ 49,000 note to Meadowlands Marketing bore interest at 9 percent per annum from date. The interest for the first 4 years was paid, as shown above, by the cash contributions of the investors. No *427 principal payments were due prior to December 31, 1983. Thereafter, principal and interest were due beginning December 31, 1984, and continuing through the year 2000, out of 50 percent of the "distributable proceeds" of the partnership from racing, breeding, and sales. The term "distributable proceeds" was defined as those proceeds in excess of costs, including reimbursement of advances by the manager of the horses, Arden Hill Farms. Beginning January 1, 2001, the principal balance owing on the note was payable in 10 equal annual installments, plus accrued interest, beginning December 31 of each year. Each note was recourse on its face, becoming nonrecourse when the group of horses reached 30 and maintained such size for 3 successive years. It was projected in the private placement memorandum that this goal would be achieved in 1999. By June 1980, 27 investors purchased 24 units in the program. Petitioners Konenkamp (1/35), Richard Doyle (1/35), Byrne Doyle (1/35), and Tripi (1/70) were among the investors. To complete the syndication, the partnership, Arden Hill Racing and Breeding Program 1980-1, purchased the 11 remaining units and executed a nonrecourse note for $ 550,000 *428 to Meadowlands Marketing, payable on the same terms and conditions as the $ 49,000 notes executed by the investors. No payments of principal or interest were made by the partnership to Meadowlands Marketing on the $ 550,000 nonrecourse note. No security agreement was ever entered into between the partnership and Meadowlands Marketing with respect to this note nor were any security agreements ever recorded with respect to the notes of the investors. The seller, Meadowlands Marketing, warranted that, during 1980 and 1981, not fewer than five of the seven horses in the program would qualify for racing (the racing warranty). If fewer than five horses qualified, Meadowlands Marketing agreed to replace the horses with qualified fillies of comparable age and bloodlines. Neither the partners nor the partnership ever elected to enforce this warranty even though only one of the horses raced during 1980 and 1981. Meadowlands Marketing further warranted that, for 10 years, none of the original seven horses (or horses replaced) would die (the mortality warranty). In the event a horse died, Meadowlands Marketing agreed to replace the horse with a filly of comparable age and bloodlines. *429 Meadowlands Marketing also warranted the fertility of the horses, guaranteeing that each of the original mares (or horses replaced) would produce no less than 1 live foal during any 3 consecutive years during the first 6 years such horse had been in breeding (the fertility warranty). Meadowlands Marketing agreed that, through December 31, 1999, the partnership could require Meadowlands Marketing to purchase 1 yearling per year, to be chosen by Meadowlands Marketing from yearlings produced by the herd (the yearling purchase option). The purchase price under this option was the greater of (1) $ 100,000, (2) the average sale price of the top 30 standardbred yearlings sold at the Tattersalls Sales Co. auction, or (3) 5 times the stud fee of the yearling. The partnership never exercised its rights under this option. The partnership entered into a management agreement with Arden Hill Farms dated June 16, 1980 (the management agreement), wherein Arden Hill Farms agreed to provide for the care, maintenance, racing, and breeding of the horses and pay all costs and expenses associated with those duties. In return, the partnership agreed to pay Arden Hill Farms $ 210,000 per year for 1980 *430 and 1981, to be increased if racing earnings exceeded $ 210,000 by the amount payable for drivers' and trainers' fees (usually 10 percent of the winning purse). For 1982 and thereafter, with respect to horses involved in racing, Arden Hill Farms paid all expenses for such horses and the management fee would be 70 percent of all purses won by such horses. For 1982 and 1983, for horses in the breeding program, the management fees were $ 3,500 per broodmare or $ 1,500 per weanling or yearling. For 1984 and thereafter, the management fee for such horses would be "standard rates as in effect from time to time" plus 10 percent of the proceeds from sales of horses from the herd. Additionally, the partnership agreed to pay Arden Hill Farms $ 70,000 in 1982 and $ 77,000 in 1983 to arrange for breeding of the broodmares. After 1983, the partnership was directly responsible for paying all stud and breeding fees. The management agreement provided for Arden Hill Farms to advance to the partnership "shortfall advances", explained as those funds necessary for management and breeding fees to the extent the partnership had insufficient funds to meet those obligations. The shortfall advances *431 also included interest due on the limited partners' notes to Meadowlands Marketing, to the extent the net income of the partnership allocated to the limited partners, plus $ 4,410 during 1981, $ 4,000 during 1982, and $ 4,000 during 1983, was insufficient to pay such interest. The "shortfall advances" were unsecured, did not bear interest, and were specifically without recourse to the personal assets of the general or limited partners. The agreement required repayment of "shortfall advances" prior to distributions to partners except for amounts necessary to pay interest on the partners' notes owing to Meadowlands Marketing. The agreement required final payment of all unpaid "shortfall advances" on December 31, 2001. The management agreement was for a term of 10 years, automatically renewable from year to year thereafter, and was terminable by either party upon proper notice to the other. Should the partnership elect to terminate, the management agreement required payment of all sums due Arden Hill Farms, including all "shortfall advances", on or before the date of termination. The seven horses in the Racing & Breeding Program were Armbro Waveway, Armbro Waldorf, Armbro Winsome, *432 Countess Dolly, Precious Love, One Over Prime, and Arden's Formal, all 2-year old fillies in 1980. The USTA registration of the horses remained in the name of Meadowlands Marketing, and the partnership name was not registered with any State racing commission. Armbro Waldorf, Armbro Waveway, One Over Prime, and Arden's Formal never raced in the Grand Circuit or in major stakes races. Several foals of some of the mares were syndicated by Mr. Farley in other standardbred programs, and there is no evidence in the record that the partnership or its partners received compensation for these foals. The private placement memorandum included projections of profits and losses of the partnership for the years 1980 through 2010. The projections also included the amount of interest payable by the investors on the $ 49,000 notes which the partners executed in favor of Meadowlands Marketing. Taken together, the anticipated deductible losses of the partnership, including the interest to be paid by the investors, were projected as follows: Loss Per Unit
Cash Paid
Loss
Year
(including interest)
Per Unit
For 35 Units
1980
$ 33,800
$ 10,000
$ 1,181,000
1981
22,300
10,000
781,600
1982
10,400
4,000
365,000
1983
10,100
4,000
353,400
*433 The actual losses reported by the partnership for the 4 years were less than the amounts projected in the private placement memorandum. However, the partners individually deducted partnership losses greater than the amounts projected in the private placement memorandum per unit by virtue of the fact that 11 units were purchased directly by the partnership rather than other investors. As a result, the distributable portion of the partnership losses for 11 units was allocated to the investors who purchased the 24 units. AHF Standardbred Breeding Program
This program was promoted by Mr. Farley and Meadowlands Marketing in a private placement memorandum dated November 1, 1980. It was structured along the same lines as the Racing and Breeding Program except that this program was essentially for breeding whereas the other program involved racing and breeding. This program, the breeding program, consisted of 10 mares owned by Meadowlands Marketing, and 35 units were to be sold to investors at $ 115,000 per unit. Although the horses in this program were for breeding, it was anticipated that selected foals would be retained and raced and other foals would be sold. It was expected *434 that this program would increase in size to 48 horses by the year 2000 or 2006. Each unit represented an undivided 1/35 interest in the horses. All units were to be contributed to a limited partnership, AHF Standardbred Breeding Program (the breeding program). The $ 115,000 per unit was payable $ 40,000 cash over 5 years and execution of a $ 75,000 promissory note payable to Meadowlands Marketing. As was the case with the racing and breeding program, the investment proceeds went to Meadowlands Marketing and the partnership as follows: Cash Payments: [1]
Payable To
Installment
Due Date
Meadowlands Marketing
$ 4,000 at subscription
$  1,000 cash downpayment
for horses
1,886 advance interest
on $ 75,000 note
16,000 3/31/81
7,486 interest on
$ 75,000 note
10,000 3/31/82
7,514 interest on
$ 75,000 note
9,000 3/31/83
7,486 interest on
$ 75,000 note
1,000 3/31/84
1,000 interest on
$ 75,000 note
Total $ 40,000 $ 26,372 *435 Payable To
Installment
Partnership
$ 4,000
$ 1,114 capital contribution
16,000
8,514 capital contribution
10,000
2,486 capital contribution
9,000
1,514 capital contribution
1,000
-0-
Total $ 40,000
$ 13,628
Promissory Note: Amount To
Amount To
Amount   Date Executed
Meadowlands Marketing
Partnership
$ 75,000  at subscription
$ 75,000
- 0 -
Total Investment:
Per Unit:
Amount To
Amount To
Cash and Note Amount
Meadowlands Marketing
Partnership
$ 115,000 $ 101,372
$ 13,628
For 35 Units:
$ 4,025,000 $ 3,548,020
$ 476,980
The selling price by Meadowlands Marketing for the 10 mares was $ 2,750,000, to be paid as set out above. [7] These horses were purchased by Meadowlands Marketing from Arden Hill Farms during 1980 for $ 1 million and had been purchased by Arden Hill Farms between 1977 and 1980 for $ 574,500. The prices as well as the cost of each horse were not itemized. *436 Each $ 75,000 note bore interest at 10 percent per annum from date and was payable as follows: Interest only, as shown above, and from 1983 through 2001, principal and interest were payable to the extent of 30 percent of proceeds from breeding and sales of horses, less expenses attributable thereto. All payments of principal during this period were subordinate to Arden Hill Farms for shortfall advances to the partnership. Commencing in the year 2002, the remaining principal balance was due, payable in 10 equal annual installments. Each note was recourse on its face but would become nonrecourse when the total number of horses in the program reached 48. It was anticipated that this number would be reached in either the year 2000 or the year 2006. A total of 20 units were purchased and contributed to the partnership. The investors, who were limited partners, were allocated 98 percent of the profits and losses of the partnership. The general partner was an individual named Mr. William Lightner who had no experience in standardbreds other than as an investor in Mr. Farley's programs. The general partner made no capital contribution to the partnership and was allocated 2 percent *437 of the profits and losses. One of the conditions of this program was that, if fewer than 35 units subscribed, the number of horses in the program would be reduced by dividing the number of units actually subscribing by 3.5. If the result was a fraction, the next whole number represented the number of horses which would be in the program. The investors would then execute a nonrecourse note to Meadowlands Marketing for the fractional interest in the horse. Since 20 units subscribed to the program, application of the formula resulted in the number 5.7. Thus, under the formula, six horses would make up the program. Mr. Farley testified that, because the program would have a better chance of success with eight horses, it was decided that eight horses would be sold to the investors. A nonrecourse note of $ 550,000 was executed by the partnership to Meadowlands Marketing in payment for the horses in excess of 5.7. However, the total selling price to the investors remained at $ 2,750,000, even though that price represented the selling price for 10 horses. Thus, the investors obligated themselves for 10 horses, received only eight horses, and committed themselves through the partnership *438 for an additional liability of $ 550,000 for 2.3 horses. As in the racing and breeding program, Meadowlands Marketing provided a mortality warranty, except that the warranty applied for a period of 3 years from date of the acquisition agreement. In the event a horse died, Meadowlands Marketing agreed to replace the horse with a mare of comparable age and bloodlines. Meadowlands Marketing also warranted the fertility of the horses identical to the fertility warranty which was provided in the racing and breeding program. However, in this program, Meadowlands Marketing further warranted that 70 percent of the original mares bred in any year would produce live foals, and that, in each year through 1999, the mares would produce no fewer than two fillies. Meadowlands Marketing agreed to replace any nonproducing mares with mares of comparable age and bloodlines and to deliver sufficient foals or substitute fillies for colts (all of comparable bloodlines) to make up the deficiency from the rates warranted. A yearling purchase option was also provided in this program from January 1, 1983, through December 31, 1999. This option was similar to the yearling purchase option in the racing *439 and breeding program, except that the price to be paid by Meadowlands Marketing for each yearling each year was the greater of (1) $ 150,000, (2) the average sale price of the top 30 standardbred yearlings sold at the Tattersalls Sales Co. auction, or (3) five times the stud fee of the yearling. The partnership never exercised its rights under this yearling purchase provision. The partnership entered into a management agreement with Arden Hill Farms in December 1980 wherein Arden Hill Farms agreed to provide for the care, maintenance, racing, and breeding of the horses and pay all costs and expenses associated with those duties. In return, the partnership agreed to pay Arden Hill Farms management fees of $ 26,000 per year for 1980 and 1981, $ 32,000 for 1982, $ 35,200 for 1983, and, in each year thereafter, the greater of $ 35,200 or 10 percent of the revenues from sales of horses. In addition, during 1980 and 1981, the partnership agreed to pay Arden Hill Farms a fee of $ 4,000 ($ 2,000 for weanlings and yearlings) per horse per year. From and after 1982, with respect to horses not involved in racing activities, the partnership agreed to pay Arden Hill Farms's standard boarding *440 rates. As to horses which were racing, the partnership agreed to pay a fee equal to 100 percent of all purses won by the horse, to a maximum of $ 30,000 per horse over its racing career, and thereafter 50 percent of its winnings, with Arden Hill Farms to pay all racing expenses. The management agreement contained provisions for Arden Hill Farms to advance to the program, as "shortfall advances", funds necessary to pay management and breeding fees, and interest on the limited partners' notes to Meadowlands Marketing, to the extent the net income of the program plus $ 7,486 per limited partner during 1981, $ 7,514 per limited partner during 1982, $ 7,486 per limited partner during 1983, and $ 1,000 per limited partner during 1984 was insufficient to pay such interest. The "shortfall advances" were unsecured, did not bear interest, and were specifically without recourse to the limited partners. The management agreement required repayment of "shortfall advances" prior to distributions to partners except for distributions necessary to pay interest on the partners' notes to Meadowlands Marketing. Final payment of all unpaid "shortfall advances" was required on December 31, 2012. The *441 management agreement was for 10 years, automatically renewable from year to year thereafter, and was terminable by either party upon proper notice to the other. Should the agreement be terminated by the partnership, the agreement required payment of all sums due Arden Hill Farms, including all "shortfall advances", on or before the date of termination. In the private placement memorandum, it was disclosed that, in order to meet expenses, the partnership would be required to obtain a loan from a commercial bank in the amount of at least $ 200,000. Meadowlands Marketing agreed to arrange and guarantee a line of credit for the partnership in that amount, for a fee of $ 25,000. On December 29, 1980, the partnership executed a $ 175,000 nonrecourse note to Citizens State Bank of New Jersey. This note presumably reflected the loan referred to in the private placement memorandum. The 10 mares identified in the private placement memorandum for this program were: Best of Star, Bye Bye Skipa, Little Texas, Lady Be Careful, Trotwood Candy, Robin Lohman, Posture, Adiosa Travel, Silent Tribute, and Getting Ready. The two horses which were not conveyed to the program were Robin Lohman and *442 Little Texas. In the private placement memorandum, there was included a list of the prior syndication activities of Arden Hill Farms. The list identified 27 racing and breeding syndications, including single horses and groups of horses. Lady Be Careful and Little Texas were included on this list as having been syndicated in 1979. In an earlier portion of the private placement memorandum, in referring to the 10 horses to be syndicated, there is the statement that "some of these horses were syndicated to investors and then either repurchased, or swapped for other horses, by AHF subsequent to the initial purchase." There are no disclosures in the private placement memorandum which would clarify the title to Lady Be Careful and Little Texas. Based on evidence produced at trial, Meadowlands Marketing did not have clear title to Lady Be Careful at the time this breeding program was offered to investors. The private placement memorandum made no disclosures as to previous sales of Bye Bye Skipa; however, evidence produced at trial established that substantial interests in this horse were sold prior to syndication of this program, including an interest to petitioner Richard Doyle. Moreover, *443 on September 15, 1980, just prior to the syndication, Mr. Farley pledged Bye Bye Skipa, Little Texas, and Posture, to secure a $ 110,000 agreement by Mr. Farley to purchase two other horses from Woodstock Stud. Although documentation was produced which purported to establish a reacquisition of the outstanding interests in some of these horses, the dates for such reacquisitions appear to have been sometime after syndication of the breeding program on December 29, 1980. No evidence was produced to show a release of Bye Bye Skipa, Little Texas, and Posture for the $ 110,000 pledge to Woodstock Stud dated September 15, 1980. All of the horses remained registered with the USTA in the name of Arden Hill Farms or Meadowlands Marketing throughout the years at issue. The private placement memorandum included projections of profits and losses of the partnership for the years 1980 through 2010. The projections also included the interest payable by investors on the $ 75,000 notes to Meadowland Marketing. Taken together, the projected deductible losses (including interest) compared with the cash paid was as follows: Total Losses
Cash Paid
Year
and Interest
Loss Per Unit
Per Unit
1980
$ 736,200
$ 21,000
$ 7,000
1981
1,441,500
41,200
13,000
1982
1,005,300
28,700
10,000
*444 Petitioner Ronald J. Kims was an investor for a 1/35 interest in the AHF Standardbred Breeding Program. The distributable shares of losses which were actually allocated to Mr. Kims for the years 1980, 1981, and 1982 were, respectively, $ 28,252, $ 31,076, and $ 32,871. These amounts were claimed on Mr. and Mrs. Kims' tax returns, except for 1982 they only claimed $ 10,000, the amount of their cash investment that year, instead of the $ 32,871 reported by the partnership on Form K-1 issued to Mr. Kims. For 1980 and 1981, petitioners also claimed Schedule A interest deductions of $ 1,886 and $ 7,486 for interest paid to Meadowlands Marketing and Arden Hill Farms. No interest deduction was claimed by Mr. and Mrs. Kims for 1982. Bethel Standardbreds, Inc.
This was a program offered in 1981 by Daniel J. Farley, Inc. (DJF), and was explained in an undated three-page document entitled "Structure of Deal". The program consisted of four horses, to be sold by DJF to investors, with each investor unit representing a 10-percent interest in the four horses. The selling price for the four horses was $ 400,000. Each investor executed a $ 40,000 note for each unit. The explanatory *445 document did not provide any information as to the terms of the note, when it was payable, and the rate of interest. On the subscription date, in addition to the $ 40,000 note, each investor was required to pay $ 5,500 cash and execute two additional notes, one in the amount of $ 5,000, payable June 15, 1982, and the other in the amount of $ 4,250, payable June 15, 1983. The horses in this program were not identified in the explanatory document except that one horse was described as "aged" and would race beginning November 1, 1981, and the three other horses were "yearlings" which could race beginning in June 1982. Racing income would be applied first to pay training expenses, second to pay interest on the investors' notes, and third to pay the investors' notes due June 15, 1983. All income in excess of these payments would be divided equally between the investors and Arden Hill Farms, manager of the horses. During 1982, the investors were to organize a corporation and contribute their interests in the horses to the corporation for stock. The corporation would then purchase four additional horses for $ 400,000. The explanatory document concluded that it was the expectation *446 that a buyer would be found, and the corporation would be sold during 1983 at a profit to the investors. The document summarized the tax benefits an investor would derive from a 10-percent interest in the program for the years 1981 and 1982. The tax savings were described as "Cash Profit to Investor". Following were the projected tax benefits: 1981
1982
Depreciation
$ 7,250
$ 20,800
Interest
3,680
-  Legal
500
-  Expenses
10,570
-  Total
$ 22,000
$ 20,800
Tax savings at 50%
$ 11,000
$ 10,400
Cash in
5,500
5,770
Cash profit to investor
$ 5,500
$ 4,630
Ten units were sold in this program. The four horses which were transferred into the program were: Casey G., Arden's Carie, Dream Drummer, and Adiosa Eagle. During 1982, Arden's True Story was substituted for Adiosa Eagle and Arden's Dream was substituted for Dream Drummer. The investors and DJF executed an agreement of acquisition dated October 1, 1981, to effect transfer of the horses into the program. The agreement contained warranties by DJF that, for 3 years, DJF would replace any original horse in the herd that died with a horse of comparable age and bloodlines. DJF further warranted that, *447 during 1982, at least two of the horses would race and, in the event two horses did not race, such horses would be replaced with horses capable of racing. The $ 40,000 note executed for each 10-percent unit was payable to DJF, in five annual principal payments of $ 8,000, plus interest, commencing June 30, 1983, and continuing on the same date of each year thereafter. Interest on the note was 20 percent per annum from date until September 30, 1983, calculated under the rule of 78's and 10 percent per annum thereafter. This note and the two other notes were full recourse obligations. Bethel Standardbreds, Inc. (Bethel), was incorporated in 1982 with Mr. Farley as President. He owned 1 share of stock. The investors owned the remainder of the stock and contributed their interests in the four horses to the corporation. The shareholders filed an election under section 1361 to have the corporation treated, for tax purposes, as an S corporation. The election was accepted by the Internal Revenue Service. The record is silent as to whether the corporation purchased four additional horses as was indicated would be done in the explanatory document. Petitioner Eloise S. Brown, wife *448 of petitioner Howard G. Brown, was one of the 10-percent investors in this program. None of the other petitioners in these consolidated cases were participants in this program. Shortly after the horses were sold to the investors, Mr. Farley advised them that, "in order to make this deal work", the investor notes of $ 5,000 each, due June 15, 1982, would be discounted with the Citizens Bank. As of January 11, 1982, Citizens Bank had discounted several of the investors' notes, including the note of Mrs. Brown. The proceeds of these notes were applied to several loans due and owing to Citizens Bank by Mr. Farley, Meadowlands Marketing, and Arden Hill Farms. In June 1982, Mrs. Brown paid Citizens Bank $ 5,778.33 on her note which Mr. Farley had discounted. In June 1982, Mr. and Mrs. Brown coincidentally received from Mr. Farley the amount of $ 5,778 as follows: $ 5,000 for the buy-back of their one-fifth interest in Real Dream, a standardbred horse which the Browns had purchased from Arden Hill Farms in 1979, and $ 778 in partial payment for Dream Drummer, which had been sold by the Browns to Mr. Farley in 1980 for $ 1,044. The remainder of the purchase price for Dream Drummer was *449 paid to the Browns in 1983. The $ 400,000 selling price for the four horses in this program was allocated as follows: Casey G.
$ 125,000
Arden's Carie
91,667
Dream Drummer
91,666
Adiosa Eagle
91,667
Total
$ 400,000
The horse, Casey G., was foaled on March 31, 1977, and was acquired by Arden Hill Farms at auction for $ 8,200. The record does not show the cost of the other horses in this program, except that Dream Drummer was acquired by Mr. Farley from the Browns in 1980 for $ 1,044. None of the horses in this program were registered with the USTA in the name of Bethel; the registration remained in the name of Arden Hill Farms. Arden Hill Farms pledged Casey G. to The Carolina Bank in November 1982 to secure a loan to Arden Hill Farms, turning the registration certificates over to the bank in conformity with industry practice. The security interest of the bank continued until June 22, 1984, and USTA records reflect that Casey G. was sold by Arden Hill Farms in June or July 1984 for $ 6,000. Adiosa Eagle was also pledged to The Carolina Bank by Arden Hill Farms in November 1982 and was then sold to William Price on January 1, 1983. Casey G. had racing earnings *450 totaling $ 39,338 in 1980 and 1981 and won $ 10,087 in 1982 by placing first, second, or third in 8 of 15 starts. The three yearlings were not eligible to race until 1982. By agreements dated July 1, 1983, an individual, William Price (Mr. Price), agreed to purchase the outstanding shares of Bethel from the shareholders, including Mrs. Brown, by assuming all liabilities of the corporation, including all notes and accrued interest owing by the shareholders to DJF or Mr. Farley. Mr. Price was significantly involved in other business transactions with Mr. Farley at the time he purchased the Bethel stock. The price agreed to be paid to Mrs. Brown for her 1,000 shares was $ 55,980, representing assumption of the $ 40,000 note to DJF, together with $ 11,040 accrued interest, and the $ 4,250 note to Mr. Farley payable June 15, 1983, together with $ 690 accrued interest. The total price assumed by Mr. Price for all the Bethel shares was $ 559,000. There were no negotiations between the parties nor were any valuations made of the horses in the program at the time of this purchase by Mr. Price. Keystone Standardbreds, Inc.
This program was structured exactly like the Bethel program. *451 It was offered during 1981 by DJF and explained in an undated three-page document entitled "Structure of Deal". The program also involved four horses to be sold by DJF to investors for a total price of $ 400,000. Each investor executed a note of $ 40,000 per unit, representing a 10-percent interest and paid $ 5,500 cash at the time of entry in the program. As in the Bethel program, the explanatory document did not provide any information as to the terms and conditions of the $ 40,000 note. Additionally, each investor executed two notes payable to Mr. Farley, one in the amount of $ 5,000, payable July 15, 1982, and the other in the amount of $ 4,250 payable July 15, 1983. The horses in this program were not identified in the explanatory document but were described as one 2-year-old horse and three yearlings. The four horses would be trained for racing and "with good luck" would commence racing in June 1982. Racing income would be applied, first to pay any additional training expenses incurred during 1982, second, to pay the investors' notes due June 15, 1983 (this was obviously meant to be July 15, 1983), and third to pay interest on the investors' notes due in 1982. All income *452 in excess would be divided equally between the investors and Arden Hill Farms. During 1982, the investors were to organize a corporation and contribute their interests in the horses to the corporation in exchange for stock. The corporation was authorized to purchase four additional horses for $ 400,000. It was also stated in the explanatory document that the corporation would be sold during 1983 for a profit. The tax benefits to an investor with a 10-percent interest were projected as follows: 1981
1986
Depreciation
$ 7,250
$ 20,800
Interest
2,080
--  Legal
500
--  Expenses
12,170
Total
$ 22,000
$ 20,800
Tax savings at 50%
$ 11,000
$ 10,400
Cash paid
5,500
5,770
Cash profit to investor
$ 5,500
$ 4,630
DJF over-syndicated this program in that 11 units were subscribed instead of 10. The required investment for each unit, however, remained the same. The four horses which were in this program were: Arden's Gandaulf and three yearlings, Ringinthenew, Overmatch, and Mystical Thunder. As with the Bethel program, the Keystone horses remained registered to Arden Hill Farms. The investors and DJF executed an Agreement of Acquisition dated *453 November 1, 1981, to effect the transfer of the horses. The agreement contained the same warranties provided in the Bethel program. The terms and conditions of the investors' $ 40,000 notes were identical to the $ 40,000 notes executed in the Bethel program, except that the five annual payments were due on July 31 of each year, rather than June 30, and the 20 percent annual interest rate ran through October 31, 1983, rather than September 30, 1983. The $ 40,000 notes and the other notes were also full recourse obligations. Keystone Standardbreds, Inc. (Keystone), was incorporated in March 1982, with Mr. Farley as president and sole incorporator. The investors contributed their interests in the horses to the corporation in exchange for stock. As in Bethel, the shareholders in Keystone filed an election under section 1361 to have the corporation treated for tax purposes as an S corporation. The election was accepted by the Internal Revenue Service. The record does not indicate whether the corporation purchased four additional horses as it was authorized to do in the explanatory document entitled "Structure of Deal". Petitioner Thomas C. Konenkamp was one of the investors in *454 this program. None of the other petitioners in these cases were participants in this program. The $ 5,000 investor note executed by Mr. Konenkamp, payable July 15, 1982, was discounted by Mr. Farley with Citizens State Bank in February 1982. Mr. Konenkamp paid Citizens State Bank $ 5,729.30 on June 28, 1982, which included principal and interest on the $ 5,000 note. The $ 400,000 selling price for the four horses was not allocated or apportioned among the horses on any of the records of Keystone. The record, however, indicates that one of the horses, Overmatch, was acquired by Arden Hill Farms at auction on August 7, 1981, for $ 15,000. In the fall of 1981, Mr. Farley pledged Overmatch and other horses to Standardbred Horse Sales Co. as collateral for the purchase of Shane T. Hanover, a standardbred yearling. This same horse, Overmatch, was syndicated in October 1983 in another Farley program identified as the AHF 1983-B Standardbred Racing and Breeding Program. The record does not indicate whether or how Keystone disposed of its ownership of Overmatch. Nor is there any indication of an accounting to the investors in Keystone for Overmatch. The horse, Ringinthenew, was acquired *455 by Arden Hill Farms on August 9, 1981, for $ 20,000 and was sold by Arden Hill Farms on June 7, 1984. The record also does not indicate how Keystone's ownership of this horse was accounted for to the investors. Arden Hill Farms was the breeder of Mystical Thunder. The record does not indicate what basis Arden Hill Farms had in this horse. In 1984, Arden Hill Farms transferred ownership of Mystical Thunder to three individuals, one of whom previously held a lease on Mystical Thunder with an option to purchase the horse for $ 7,500. The record does not indicate how Keystone's interest in this horse was accounted for. The record does not establish the original cost of the horse Arden's Gandaulf; however, the record shows that this horse was sold by Mr. Harper and a Mr. Franklin George on December 13, 1982, for $ 1,000. The record shows that Arden's Gandaulf was replaced in the Keystone program with Arden's Chapel Bell. The substitute was reflected in Keystone's records as a sale of Arden's Gandaulf to Arden Hill Farms for $ 5,000. The $ 5,000 selling price was recorded as an accounts receivable on Keystone's records and the record does not establish payment by Arden Hill Farms. *456 The horse Overmatch had no racing starts from 1982 through 1985 and had no race earnings. Ringinthenew had race earnings of $ 1,312 in 1982, and $ 12,247 in 1983. Mystical Thunder had race earnings of $ 871 for 1982 and 1983. Arden's Chapel Bell (the horse which was substituted for Arden's Gandaulf) was not eligible to race until 1983. Mr. Konenkamp testified that he used a portion of his equity in a standardbred horse, Meadow Michael, as payment for the $ 5,500 cash which was required at the time he made his investment in Keystone. No corporate or information tax return was filed by Keystone for 1982, and no Schedule K-1 was produced at trial; however, on their 1982 return, the Konenkamps deducted a $ 20,800 loss from Keystone. No deductions or losses were claimed by the Konenkamps from Keystone on their 1983 tax return. As in the case of Bethel, by agreements dated July 1, 1983, the same individual, Mr. Price, purchased all shares of Keystone from the shareholders by assuming their indebtedness, including accrued interest, owed to DJF and Mr. Farley. The total purchase price for Mr. Price's acquisition of the Keystone stock was $ 615,780. There were no negotiations between *457 the parties with respect to this sale. The Konenkamps did not report this transaction on their 1983 income tax return. The November 5, 1987, indictment of Mr. Farley by a Federal grand jury of 39 counts of violation of section 7206(2) included, among other charges, the aiding and abetting of individuals in filing false Federal income tax returns from standardbred horse programs, among which included four-horse racing programs involving subchapter S corporations. The infractions alleged were the backdating of documents, overvaluation of horses, oversyndication in at least two of the corporations, failure of one corporation to acquire any horses, replacement of horses without notice, and illusory financing which was never paid or, if paid, was repaid to the investor by Mr. Farley. Keystone was one of the six subchapter S corporations named in the indictment in which such infractions were alleged to have been made by Mr. Farley. Albatrick, Inc. This program was offered during 1983 by Farley and Farley, Inc. (F & F), and consisted of one horse, a standardbred yearling, named Albatrick. This horse was foaled on April 27, 1982, by Arden Hill Farms. This program involved the *458 sale of 12.5 units representing a 45-percent interest in the horse for $ 350,000. Each unit represented a 3.6-percent interest in the horse. The selling price for each unit (3.6 percent) was $ 28,000, plus $ 30,000 cash payable over 3 years. Once purchased, the investors would contribute the 45-percent interest in the horse to a subchapter S corporation, Albatrick, Inc. The corporation would then purchase an additional 45-percent interest in the horse for $ 350,000 to be paid by the corporation's execution of a $ 350,000 nonrecourse note. The $ 28,000 for each investor's unit was to be paid by execution of a $ 28,000 recourse note to F & F. Only interest was payable for the first 3 years. The principal and accrued interest were due on or before December 31, 1992. In addition to the $ 28,000 note, the $ 30,000 cash was payable over 3 years as follows: Applied to
Year
Payment
Interest
Management Expenses
1983
$ 6,000
$ 3,185
$ 2,815
1984
14,000
5,551
8,449
1985
10,000
364
9,636
Total
$ 30,000
$ 9,100
$ 20,900
Each investor was provided with a "Syndication Summary" which explained the Albatrick program. The tax benefits for 1 unit were projected *459 as follows: Cash Investment
Year
Tax Deduction
By Investor
1983
$ 13,290
$ 6,000
1984
25,456
14,000
1985
19,254
10,000
Total
$ 58,000
$ 30,000
An investor in the 50-percent tax bracket, it was explained, would save $ 29,000 in taxes over the 3 years. If the horse was successful in racing, it was anticipated that the horse would be resyndicated during 1986 at a substantial profit to the initial investors. A corporation, Albatrick, Inc., was organized by the investors on July 5, 1983. The shareholders filed an election to have the corporation treated as an S corporation under section 1361. A Form 1120S, U.S. Income Tax Return for an S corporation, was filed by Albatrick, Inc., for the year 1985; however, no returns were filed by Albatrick, Inc., for 1983 and 1984. Petitioner Eloise S. Brown purchased 1 unit in the Albatrick program. She executed a $ 28,000 note to F & F, dated July 1, 1983, for this unit. Instead of the $ 30,000 cash payment required in the syndication, Mrs. Brown executed another note, dated July 1, 1983, payable to Albatrick, Inc., in the amount of $ 18,085, bearing no interest, and payable $ 9,541 on February 15, 1984, and *460 $ 8,544 on February 15, 1985. The record is not clear as to whether this note was in lieu of the required cash payments of $ 6,000, $ 14,000, and $ 10,000, due respectively in 1983, 1984, and 1985, nor is the record clear as to how the parties arrived at the figure of $ 18,085. On February 14, 1984, Arden Hill Farms billed the Browns $ 14,000, of which $ 5,551 was for the account of F & F and $ 8,449 was payable to Albatrick, Inc. One half of this bill was paid by the Browns, and the other half was paid by Mr. Farley as part of $ 15,000 Meadowlands Marketing owed the Browns for the repurchase of a horse, Robena Lobell. The record is not clear as to why the Browns were billed $ 14,000, when the 1984 installment was only $ 9,541. The record is not clear as to whether the $ 8,544 installment due on February 15, 1985, was ever paid. Nor was any evidence produced to establish that all other payments were made by Mrs. Brown in connection with her investment in this program. The Browns reported their interest in Albatrick for 1983 as a trade or business activity on Schedule C of their income tax return. They reported no gross income from this activity and claimed deductions totaling *461 $ 10,200, all of which were disallowed by respondent. For 1984, the Browns reported their Albatrick interest as an S corporation item on Schedule E of their return, claiming a loss of $ 22,507. The Browns' 1984 tax year is not at issue in this litigation. On their 1985 income tax return, the Browns again reported their Albatrick investment as a subchapter S item on Schedule E of their return, claiming a loss of $ 19,178. This item, however, was not adjusted by respondent in the notice of deficiency for 1985. On their 1986 return, the Browns did not report any income or losses relating to Albatrick. On October 17 and 18, 1983, a consignment sale of standardbreds was held at Atlantic City, New Jersey, sponsored by Harrah's, Inc., which was conducted by Harness Breeder Sales Co. Arden Hill Farms consigned seven horses for sale at this auction. One of the horses was Albatrick. At the sale, Albatrick purportedly brought $ 145,000; however, the selling price was never paid and, in subsequent litigation between Arden Hill Farms and Harness Breeder Sales Co., it was alleged by Harness Sales Co. in a counterclaim and third party complaint against Mr. Farley that the consignment of *462 horses at this sale by Arden Hill Farms was a subterfuge, and that Arden Hill Farms had repurchased the horses in order to inflate their value so that the horses could be sold as tax shelters to third persons at inflated prices. This case was settled. The horses were returned to Arden Hill Farms but sales commissions were paid to Harness Sales Co. There was no evidence presented at trial as to whether the investors in Albatrick knew of this purported sale nor was any evidence presented to exonerate Mr. Farley of the allegations of Harness Sales Co.
Evidence was presented at trial which showed that Albatrick was sold by Arden Hill Farms to a Mr. Jeffrey L. Mallet and a Mr. Harvey R. Heller sometime in November 1984 for $ 20,000. Mr. Farley testified that the investors' interests in Albatrick was accounted for by an exchange of their interest in Albatrick for an interest in another horse, Shane T. Hanover. Mr. Farley apparently did not advise the Browns that their interest in Albatrick, Inc., had been disposed of in this fashion because, on their 1985 return, the Browns claimed a Schedule E loss of $ 19,178 from Albatrick, Inc. (a loss which respondent has seemingly allowed, as *463 noted earlier). Albatrick's earnings were less than spectacular during the time Mrs. Brown owned her interest. The horse had five racing starts during 1984 with no earnings. There was no breeding potential on the horse because Albatrick was gelded. At all times, the USTA registration for Albatrick reflected Arden Hill Farms as owner. Shane T. Hanover Associates
This program was offered by Mr. Farley and Arden Hill Farms through a private placement memorandum dated November 9, 1981. The program involved 1 horse, a standardbred yearling, Shane T. Hanover, which was purchased at auction by Arden Hill Farms in August 1981 for $ 350,000. This program consisted of the sale of a 35-percent interest in the horse to investors for $ 700,000. The investors would then contribute their interest in the horse to a limited partnership, Shane T. Hanover Associates (the partnership). The partnership would purchase an additional 35-percent interest in the horse for $ 700,000. Arden Hill Farms, therefore, retained a 30-percent interest in the horse. It was anticipated that the horse would be raced for 2 or 3 years and, thereafter, be retired to stud. If the horse proved to be financially *464 successful, the horse would be resyndicated. The 35-percent interest to investors was divided into 25 units, with each unit representing a 1.4-percent interest in the horse. The investment was $ 58,000 per unit, payable $ 30,000 cash over 3 years, and execution of a $ 28,000 recourse note to Arden Hill Farms. Thus, the total investment for 25 units, at $ 58,000 each, amounted to $ 1,450,000. As was the case with some of the other programs offered by Mr. Farley, the cash payments went to the partnership and Arden Hill Farms as follows: Cash payments
Payable to
Payable to
Amount
Due Date
Arden Hill Farms
Partnership
$ 6,000
on Subscription
$ 3,360
$ 2,640
14,000
Feb. 15, 1982
6,496
7,504
10,000
Feb. 15, 1983
3,144
6,856
$ 30,000
$ 13,000
$ 17,000
Promissory Note
Payable to
Payable to
Amount
Date Executed
Arden Hill Farms
Partnership
$ 28,000
on Subscription
$ 28,000
-0-
Per Unit:
For 25 Units:
Cash
$ 30,000
Cash
$ 750,000
Note
28,000
Note
700,000
Total
$ 58,000
Total
$ 1,450,000
Petitioners argued at trial and on brief that the partnership purchased a *465 35-percent interest in the horse, as contemplated in the offering materials, and executed a $ 700,000 note for this interest. However, no note was produced at trial. Petitioners contend the note was either lost, misplaced, or destroyed in the volumes of records which were turned over to the Federal grand jury in the criminal investigation and prosecution of Mr. Farley. The Court finds that the partnership never executed a note for a 35-percent interest in the horse nor was it ever intended that a note would be executed by the partnership. The reason for that is because there was a material error in the offering material to the investors. The offering memorandum represented that two 35-percent interests in the horse would be sold for a total price of $ 1,400,000. The selling price for each 35-percent interest was $ 700,000. The private placement memorandum stated that the partnership would have only one activity -- the ownership and exploitation of the 70-percent interest in Shane T. Hanover. In spite of these disclosures, the investment alone for the investors was $ 1,450,000, exclusive of the $ 700,000 note to be executed by the partnership. Since the partnership did not *466 contemplate any other investments or activities other than that of 1 horse, Shane T. Hanover, it is evident that the $ 1,450,000 commitment of the investors included a 70-percent interest in the horse rather than a 35-percent interest. The partnership, therefore, never executed a $ 700,000 note because the $ 700,000 for the partnership's purchase was included in the selling price to the investors. Each $ 28,000 note was payable, interest only, at 20 percent per annum, from date, on December 31 of each year, through December 31, 1984, and 15 percent per annum thereafter. Principal payments of $ 4,000 each, plus accrued interest, were due beginning December 31, 1985, and each year thereafter through December 31, 1989. The remaining unpaid balance was due December 31, 1990. In a separate document entitled "Pre-Syndication Summary", the tax deductions flowing to the investors, per unit, were projected as follows: Tax Deduction
Cash Invested
To Partner
Per Partner
1981
$ 10,784
$ 6,000
1982
27,512
14,000
1983
20,284
10,000
Total
$ 58,580
$ 30,000
Petitioners S. Byrne and Barbara S. Doyle and Richard E. and Nancy B. Doyle invested in this program, for *467 1 and 2 units, respectively, on October 1, 1981. None of the other petitioners in these cases were involved in the Shane T. Hanover program except petitioners Howard G. and Eloise S. Brown, who acquired an interest in Shane T. Hanover in 1985 in exchange for their interest in Albatrick, Inc. On their 1981 income tax returns, petitioners (the Doyle brothers) reported their Shane T. Hanover activity on Schedule C of their returns, which they combined with the income and expenses of other Farley horse programs in which they had invested. It is not discernible from the face of Schedule C of petitioners' returns whether petitioners realized profit or loss from their Shane T. Hanover investment because of its consolidation with other Farley programs. Respondent disallowed the claimed Schedule C losses of both petitioners. For 1982, petitioners reported their Shane T. Hanover investment on Schedule E of their returns as a partnership activity. Petitioners S. Byrne and Barbara S. Doyle reported a $ 20,071 partnership loss from Shane T. Hanover, which was disallowed by respondent. Petitioners Richard E. and Nancy B. Boyle reported a $ 40,143 loss, which was also disallowed by respondent. *468 On their 1983 return, petitioners Richard E. and Nancy B. Boyle reported a Schedule E partnership loss of $ 31,984 from Shane T. Hanover Associates. No adjustment, however, was made by respondent in the notice of deficiency with respect to this loss. The 1983 tax year of petitioners S. Byrne and Barbara S. Doyle is not at issue in this proceeding. At the time Shane T. Hanover was syndicated, Arden Hill Farms owed Hanover Shoe Farms a note of $ 262,500 on the $ 350,000 purchase price of Shane T. Hanover. This indebtedness was disclosed in the offering memorandum. However, Arden Hill Farms had pledged several horses to Hanover Shoe Farms as security for its $ 262,500 note. At least one of the pledged horses, Little Texas, had previously been sold by Arden Hill Farms as part of a syndication program. On February 23, 1982, Hanover Shoe Farms was paid in full and the security on Shane T. Hanover was released. Shane T. Hanover did not race nor was he expected to race in 1981. His racing earnings for the succeeding years were: $ 6,549 for 1982; $ 11,007 for 1983; $ 129,300 for 1984; $ 139,065 for 1985; and $ 12,110 for 1986. Several of the investors between 1982 and 1987 sold *469 their partnership interests in Shane T. Hanover Associates to Mr. Farley and/or Arden Hill Farms in consideration for the release of their liabilities on the notes executed in favor of Arden Hill Farms. On February 25, 1987, Shane T. Hanover was sold to Danish Breeder's Group of Copenhagen, Denmark, for $ 350,000. The 70-percent interest in the horse which was owned by the partnership was adjudicated, pursuant to a court action, to Arden Hill Farms. Just prior to the sale, Arden Hill Farms advised petitioners Richard Doyle and Byrne Doyle that their partnership interests in Shane T. Hanover Associates had been forfeited as a result of their default in payment of the principal on their respective notes, which they had executed to Arden Hill Farms for their interests in Shane T. Hanover. No cash distributions were made to any partners in Shane T. Hanover Associates from the sale of the horse. During the time the partnership owned its 70-percent interest in Shane T. Hanover, Mr. Farley admitted in his testimony that free breeding rights to Shane T. Hanover were extended to investors in other Farley programs. There is no evidence to indicate that Shane T. Hanover Associates was ever *470 compensated for these services. Konenkamp Stables, Inc.
This program involved a 40-percent interest in one horse, Meadow Michael, which was acquired by petitioner Thomas C. Konenkamp, Jr., from Arden Hill Farms on March 30, 1979, for $ 67,600. Documentary evidence introduced at trial casts doubt as to whether Arden Hill Farms owned a 40-percent interest in this horse at the time of the sale to petitioner Konenkamp. Through various sales of interests and reacquisitions, it appears that Arden Hill Farms owned only a 28-percent interest in Meadow Michael on March 30, 1979. The interest in Meadow Michael was contributed by Mr. Konenkamp to Konenkamp Stables, Inc., an S corporation, under section 1361, in which Mr. Konenkamp was sole shareholder. For the 40-percent interest in Meadow Michael, Mr. Konenkamp executed a note dated March 30, 1979, payable to the order of Arden Hill Farms in the amount of $ 62,000, payable in yearly installments of $ 12,400 each on March 31, 1981 through 1985, plus interest at 6 percent per annum. The record is not clear as to whether or how Mr. Konenkamp paid $ 5,600 which, with the $ 62,000 note, made up the $ 67,600 purchase price of the horse. *471 There were no negotiations between Mr. Konenkamp and Mr. Farley regarding the price of the horse. A training agreement was entered into on March 30, 1979, wherein Arden Hill Farms agreed to manage, train, and care for the horse. For the first year, Mr. Konenkamp was to prepay all expenses but, for subsequent years, Arden Hill Farms was to look solely to racing earnings for payment of its expenses. If income exceeded expenses, two-thirds of the excess would go to Arden Hill Farms and one-third would go to Konenkamp Stables, Inc. Arden Hill Farms purchased the stock in Konenkamp Stables, Inc., from Mr. Konenkamp on October 15, 1981, for $ 78,900, payable $ 21,800 in cash and $ 57,100 by promissory note. However, the $ 62,000 note executed by Mr. Konenkamp dated March 30, 1979, was not then canceled. It remained an obligation owing by Mr. Konenkamp as to which he and his wife continued claiming Schedule A interest deductions to Arden Hill Farms on their 1981, 1982, and 1983 income tax returns. They did not, however, report interest income on the payments purportedly being made by Arden Hill Farms on the $ 57,100 note. On July 22, 1986, the $ 62,000 note owing by Mr. Konenkamp *472 was paid by offset and canceled. The payments by Arden Hill Farms to Mr. Konenkamp on the $ 57,100 note equaled the payments due by Mr. Konenkamp on the $ 62,000 note. The tax returns of the Konenkamps for 1980, 1981, 1982, and 1983 are at issue in these proceedings. Their Schedule A interest payments to Arden Hill Farms on the $ 62,000 note were disallowed by respondent for each of the years in question. For 1980, the Konenkamps reported a $ 34,192 loss on Schedule E of their return from Konenkamp Stables, Inc., which was disallowed by respondent in the notice of deficiency. With respect to the sale of their Konenkamp Stables, Inc., stock in 1981, petitioners reported the sale as an installment sale, reporting $ 21,800 as a long-term capital gain installment on Schedule D of their 1981 return, and a $ 15,400 long-term capital gain installment on their 1982 return. In the notice of deficiency, respondent made no adjustments to the 1981 and 1982 reported installment sale gains. On their 1983 return, the Konenkamps reported a Schedule D long-term capital gain installment of $ 14,600 from the sale of their Konenkamp Stables, Inc. stock. In the notice of deficiency, respondent *473 disallowed the 60-percent long-term capital gain deduction claimed by petitioners, treating the entire $ 14,600 as ordinary income. No such adjustments were made as to the 1981 and 1982 installments reported by petitioners. Lady Linda Bret
Petitioners Richard Doyle, Byrne Doyle, and Thomas C. Konenkamp each reported Schedule C losses on their income tax returns for 1980 and 1981 from an activity which was described as "horse racing" or "horse racing and breeding". One of the horses in this activity was a standardbred mare, Lady Linda Bret. On the depreciation schedules accompanying Schedule C of petitioners' returns, this horse was not identified by name but was referred to as a "broodmare" acquired in 1980 at a cost of $ 20,000. Each petitioner claimed depreciation of $ 10,000 on this horse for each of the years 1980 and 1981. Mr. Konenkamp contends that five individuals, including himself, and petitioners Byrne Doyle and Richard Doyle had each purchased a one-fifth interest in the horse in 1980 for $ 20,000 each. Petitioner Byrne Doyle contends that he executed a note in the amount of $ 20,000 for his interest. Neither the note nor any other documentary evidence regarding *474 this horse was introduced at trial. Mr. Konenkamp and Byrne Doyle were the only persons who testified about Lady Linda Bret, and their testimony was in very general terms. However, on their 1983 income tax returns, Mr. Konenkamp and Byrne Doyle each filed a Form 4684, Casualties and Thefts, in which they reported receipt of $ 3,500 during 1983 for the loss of a race horse acquired in 1980 having a zero basis. The $ 3,500 reported income was carried over to Form 4797, Supplemental Schedule of Gains and Losses, and reported as ordinary income. Petitioner Richard Doyle's 1983 return did not report such income related to Lady Linda Bret. The Court finds that the horse referred to on the returns of petitioners as a "broodmare" was Lady Linda Bret. In the notices of deficiency, respondent disallowed the Schedule C losses claimed by petitioners Konenkamp, Byrne Doyle, and Richard Doyle on their 1980 and 1981 returns, which included the depreciation claimed on Lady Linda Bret. Respondent made no adjustment to the $ 3,500 ordinary income reported by petitioner Konenkamp on his 1983 return from the loss of Lady Linda Bret. The 1983 return of petitioner Byrne Doyle is not before the *475 Court in this litigation. Majicobb and Frosty Move
The horse Majicobb involves petitioners S. Byrne and Barbara S. Doyle with respect to their 1980, 1981, and 1982 income tax returns. This horse was an 8-year-old standardbred mare which was acquired by Arden Hill Farms at a claiming race for $ 3,600 on October 19, 1978. Petitioner Byrne Doyle purchased the horse from Arden Hill Farms on December 20, 1978. The invoice recites a selling price of $ 45,000; however, petitioners contend that $ 10,000 represented prepaid expenses, and $ 35,000 was the purchase price of the horse. On the depreciation schedule accompanying Schedule C of their 1980 income tax return, the cost or basis for this horse is $ 35,000. Several horses were carried on petitioners' depreciation schedule for the years at issue, and none of the horses are identified by name. Majicobb was identified as an "aged broodmare". The record is not clear whether petitioners claimed depreciation on Majicobb for 1981 and 1982 because the copy of their income tax returns submitted into evidence does not contain the depreciation schedule for 1981 and 1982. No income from either racing or breeding was reported by petitioners *476 from their Schedule C racing activity for 1980, 1981, and 1982. The $ 45,000 for the acquisition of Majicobb was accounted for by payment of $ 10,000 cash and execution of a $ 35,000 note to Arden Hill Farms, payable $ 12,000 on or before December 15, 1981, $ 12,000 on or before December 15, 1982, and $ 11,000 on or before December 31, 1983. The terms and conditions of the sale were not negotiated. At the time of purchase, a training agreement was entered into wherein Arden Hill Farms was to be paid for its expenses in training the horse solely out of racing income. All income in excess of expenses would be divided, two-thirds to Arden Hill Farms and one-third to petitioners. On February 15, 1979, the parties entered into a maintenance agreement. The agreement recited that, because of injuries, which were not specified, Majicobb would not race but instead would become a broodmare. Under the agreement, Arden Hill Farms assumed all costs for breeding the mare and agreed to purchase three of its foals at set prices of $ 12,000 for the 1980 foal, $ 12,000 for the 1981 foal, and $ 11,000 for the 1982 foal. In the event Majicobb did not foal in any of these years, Arden Hill Farms *477 agreed to purchase the next year's foal at the agreed price. Majicobb foaled in 1980 and 1981 but did not foal in 1982. With respect to the 1980 and 1981 foals, Byrne Doyle, on the advice of Mr. Farley, conveyed each foal to his four children in trust, with Byrne Doyle as trustee, for a recited consideration of $ 1. The 1980 foal was sold by Byrne Doyle's children to Arden Hill Farms on June 30, 1980, for $ 15,230, for which four checks of $ 3,807.50 each were issued by Arden Hill Farms. There is no explanation in the record as to why the foal was sold for $ 15,230 when the maintenance agreement provided that the price of the 1980 foal would be $ 12,000. On the same day, Arden Hill Farms billed Byrne Doyle $ 15,230 for principal and interest due on the $ 35,000 note which Byrne Doyle had executed as part of the purchase price of the horse. The 1981 foal was also sold by Byrne Doyle's children to Arden Hill Farms for $ 13,380 on June 30, 1981. Again, the parties presented no evidence as to why this amount differed from the amount set out in the maintenance agreement. On September 9, 1981, Arden Hill Farms issued a check to Byrne Doyle, as trustee, for $ 13,380. The record *478 is not clear whether or when Byrne Doyle paid the $ 12,000 installment due in 1982 on his $ 35,000 note. However, on February 24, 1983, Mr. Farley issued a check for $ 12,700 to Byrne Doyle, presumably for the third foal of Majicobb, and on March 4, 1983, Byrne Doyle issued a check for $ 12,720 to Mr. Farley presumably for the 1983 principal and interest due on the $ 35,000 note. The horse, Frosty Move, involves petitioners Richard E. and Nancy B. Doyle with respect to their 1980, 1981, 1982, and 1983 income tax returns. This horse was a 6-year-old standardbred racing mare which was acquired by Arden Hill Farms at a claiming race on May 25, 1978, for $ 4,800. In October 1978, Arden Hill Farms entered the horse in a claiming race for $ 4,200, but there were no takers at that price. Petitioner Richard Doyle purchased the horse from Arden Hill Farms on December 20, 1978, for $ 45,000. Petitioners, however, carried this horse for depreciation purposes at $ 35,000, contending that $ 10,000 of the purchase price was for prepaid expenses. This horse was part of a horse racing activity, along with other horses, the income and expenses of which petitioners reported on Schedule C of their *479 income tax returns for 1980, 1981, and 1982. They did not file a Schedule C for this activity on their 1983 return. Petitioners reported no gross income from this activity on their 1980 and 1981 returns and reported $ 1,750 gross income on their 1982 return. Frosty Move was not identified by name on petitioners' 1980 return but was referred to as an "aged broodmare". A training agreement and a maintenance agreement were also entered into with Arden Hill Farms which contained the same terms and conditions as the agreements involving Majicobb. As to the purchase price of Frosty Move, the record consists of Richard Doyle's uncanceled check for $ 10,000 and a $ 35,000 note payable in installments identical to the $ 35,000 note executed by Richard Doyle's brother, Byrne, for Majicobb. It appears that no payments were made on the Frosty Move note. Petitioner Richard Doyle contends he purchased Frosty Move for $ 10,000 cash only. The registered owner of Majicobb and Frosty Move, according to USTA records for each of the years at issue, was Arden Hill Farms. In June 1980, Mr. Farley resyndicated Majicobb and Frosty Move through Daniel J. Farley, Inc., as part of a standardbred program *480 known as "Ohio #1". Neither Byrne Doyle nor Richard Doyle invested in this program, and Mr. Farley did not inform petitioners Richard Doyle and Byrne Doyle that their horses had been sold. Two foals of Frosty Move, born in 1980 and 1981, were also subsequently sold by Arden Hill Farms to third parties, and the record does not reflect any payments or accountings to petitioner Richard Doyle for the foals. The Expert Witnesses
Three experts testified at trial with respect to the value of the horses and the value of the warranties which went with some of the programs. Petitioners offered the expert opinion of Howard Klohr as to the value of the horses in the Racing & Breeding Program, the Breeding Program, and Shane T. Hanover Associates. Mr. Klohr attended Nassau Community College for 2 years and, at the time of trial, had approximately 20 years' experience in the standardbred industry. He owns three businesses: Clubhouse Brokerage, Inc., through which he acts as an insurance agent for a company insuring standardbred horses; Empire Standardbred Sales Corp., through which he buys and sells standardbreds; and Equine Evaluations, through which he appraises horses. He has been *481 involved in the horse insurance business as an agent since 1972 or 1973 and served as the agent for livestock transportation and mortality policies issued to the Farley companies covering horses involved in the standardbred programs at issue in these cases. John Bradley was another of petitioners' experts who testified as to the value of the horses in the Breeding Program, Bethel, and Keystone programs, as well as individual horses, Meadow Michael, Robena Lobell, Majicobb, Frosty Move, Albatrick, and Sportscaster. Mr. Bradley attended the University of Maryland for 2 years as a journalism major. He has been involved with the standardbred industry since 1966. At the time of trial, Mr. Bradley owned Bradley Standardbred Agency, a standardbred consulting firm established in 1984. Prior to starting his own business, Mr. Bradley was program director at three standardbred racetracks and managed two major standardbred sales companies. Approximately one-third of Mr. Bradley's business involves researching standardbred pedigrees, an activity he has been engaged in since 1968. Since 1974, Mr. Bradley has performed market research and appraisals of standardbreds for major horse farms, *482 sales companies, insurance companies and banks. In the course of his business, Mr. Bradley attends the major standardbred sales and keeps abreast of breeding and racing results in the standardbred industry. Peter L. Rhulen testified as respondent's expert on the value of all the horses in these cases. Mr. Rhulen obtained a bachelor's degree in insurance and finance from the University of Connecticut in 1959. He is president of the Rhulen Agency, Inc., the largest horse-related insurance agency in North America, and vice president of Frontier Insurance Co., a public insurance company licensed in approximately 20 States. He has been involved with the standardbred industry as an owner, insurer, and breeder since 1958 and has been appraising standardbreds for approximately 20 years. Dealings Among the Entities
The offices and mailing addresses of Arden Hill Farms and all of the Farley companies were the same as Mr. Farley's tax preparation office. Similarly, the mailing addresses of each of the partnerships and corporations involved in these cases were the same as Mr. Farley's office address. Thus, correspondence from the Farley companies to the partnerships and corporations *483 was addressed to the entities at the same office from which it originated. In several instances, petitioners were not aware of information contained in such correspondence, suggesting that the Farley companies and Arden Hill Farms may not have consistently sent copies of correspondence addressed to the entities to the individual investors. Mr. Farley and Mr. Price
During 1983, Mr. Farley became acquainted with Mr. Price. At that time, Mr. Price was attempting to develop a golf course and time-share condominium development at Pines, North Carolina. Mr. Price was experiencing difficulty in financing his development and drew Mr. Farley's interest in the project. Mr. Farley advanced moneys to the development; however, the amount of his advances was not established at trial. During 1983, Mr. Farley acquired from Mr. Price a one-half interest in the project. The amount for that acquisition was also not established. At that time, the project was known as the Pines Golf and Resort Club (the Pines). It was, by no means, fully developed and extensive additional financing was necessary. On July 1, 1983, Mr. Farley and Mr. Price executed several agreements wherein Mr. Price purchased *484 all of the stock in the following seven subchapter S corporations, which were in various standardbred programs promoted by Mr. Farley: Bethel Standardbreds, Inc. Keystone Standardbreds, Inc. Action Standardbred, Inc. Bridgeville Standardbred, Inc. Phoebe Standardbred, Inc. Tuckey Standardbred, Inc. Washington Standardbred, Inc. Two of these corporations are readily identifiable as programs at issue in these cases. In the acquisition of these corporations, Mr. Price assumed all of the debts of the corporations and the personal notes the shareholders had executed in purchasing the horses. The total assumed debt by Mr. Price for these seven corporations was $4,459,032. None of the shareholders, including petitioners herein, engaged in any negotiations with Mr. Price, nor were there any negotiations between Mr. Price and Mr. Farley. There was no cash paid by Mr. Price, nor did petitioners receive any cash. The $4,459,032 liabilities assumed by Mr. Price far exceeded the prices that the investor-stockholders had paid into the programs. None of the programs had attained any measure of success as of 1983, nor is there any indication that the programs ever became *485 successful or showed promise of being successful at the time of the transaction with Mr. Price. Michael Metcalfe
Mr. Metcalfe lived in Florida and was hired by Mr. Farley in 1980 as a trainer and driver of the standardbreds. During the winter months, Mr. Metcalfe trained the horses in Florida, then traveled with the horses to the northeast during racing season. At the end of 1983, when his finances were straining, Mr. Farley decided not to sent the horses to Florida for the winter. Mr. Metcalfe returned to Florida, where he continued training and driving for other employers. During the summer of 1984, Mr. Metcalfe was approached by Mr. Farley to purchase Arden Hill Farms and the horses. At the time, there were from 110 to 120 horses at Arden Hill Farms. Mr. Metcalfe did not have the 3 to 4 million dollars which was required to purchase the property; however, he felt that he could take over and derive sufficient racing income to operate the farm. He was primarily interested in the horses rather than the farm, and principally those horses which were racing. There were approximately 25 racing horses in the total group. Mr. Metcalfe purchased the farm, including the horses, *486 and operated it for 2 years. The income realized from racing was not sufficient to sustain the farm. He began selling horses, one by one, to pay for recurring feed and other expenses. Over the period of 1 year, he sold from 25 to 30 horses. Finally, he could no longer operate in this fashion and gave up the operation. Several of the race horses which were included in the transaction with Mr. Metcalfe were: Casey G., Mystical Thunder, Dream Drummer, Adiosa Eagle, Albatrick, Armbro Winsome, Precious Love, One Over Prime, Armbro Waldorf, and Armbro Waveway. Most of these horses were sold by Mr. Metcalfe in his attempts to keep the operation afloat. He sold these horses at will; he did not seek permission or authority to do so from Mr. Farley, Mr. Price, or any petitioners in these cases; nor did he notify anyone or account to anyone on the sales proceeds. Mr. Metcalfe acted and dealt with the horses as owner and pursued the business as his own. Kathleen Welch
Ms. Welch was the office manager for Arden Hill Farms and was employed by Mr. Farley from November 1981 to January 12, 1984. Her duties included preparation of the payroll and checks for payment of all of Mr. Farley's *487 operations. She was familiar with all bank accounts maintained by Mr. Farley, which included checking accounts for the Racing & Breeding Program and for Shane T. Hanover Associates. During the entire period she was employed by Mr. Farley, his operations were constantly plagued with inadequate cash flow. As a result, bills were paid out of whatever accounts had positive balances, including accounts of the standardbred programs. Mr. Farley maintained a personal account and, frequently, moneys were drawn out of various other accounts and transferred to Mr. Farley's personal account. On occasion, checks received where were payable to the standardbred programs were deposited in Mr. Farley's personal account. On a weekly basis, a check of $350 was paid to Mr. Farley's wife out of Mr. Farley's personal account. Occasionally, checks were issued to Mr. Farley's brother George, even though George Farley rendered no services to the standardbred programs. OPINION Respondent disallowed losses and deductions claimed by petitioners in each of several transactions wherein they and their partnerships or corporations acquired an interest in standardbreds from Mr. Farley or a Farley company. *488 Respondent contends that the transactions should not be recognized for tax purposes because they had no economic substance, the purchase prices of the standardbreds by the investors grossly exceeded the fair market value of the horses, and there was no bona fide transfer of the benefits and burdens of ownership of the standardbreds. Several alternative positions were asserted by respondent which are set out earlier in this opinion and which need not be repeated here. Respondent also determined that petitioners were liable for additions to tax under sections 6653(a)(1) and (2), 6659, and 6661 and increased interest under section 6621(c). The Farley standardbred programs involved in these cases are described in detail in the findings of fact. The various programs, while differing from one another in some respects, also had in common many factors. Each program was promoted by Mr. Farley, the tax adviser and income tax return preparer of all petitioners except petitioners Ronald J. and Lillian T. Kims. In each program, the horses were purchased from a Farley-affiliated company at prices greatly in excess of the cost of the horses. Petitioners did not negotiate the prices at which *489 the horses were purchased. In most instances, a greater portion of the purchase price was paid by long-term promissory notes, recourse on face, but requiring no principal payments for several years. At approximately the date principal payments were to become due, the notes would become nonrecourse. Additionally, where applicable, a substantial portion of the cost upon which petitioners claimed depreciation was attributable to a long-term nonrecourse note of a partnership or corporation. The cash payments by investors, for the most part, were for interest and maintenance expenses. When petitioners' stock in Farley-created corporate entities was sold, the sale was arranged by Mr. Farley to an entity or person with whom he was connected. Such sales were typically timed to coincide with the expiration of depreciation deductions on the horses. As with the horse sales, the sales of corporate stocks included assumption of petitioners' individual long-term notes as well as the notes owing by the corporations. In all but one program, the USTA registered owner of the horses remained a Farley company (usually Arden Hill Farms), and all of the horses remained in the possession and control *490 of Arden Hill Farms. In sum, the similarities between the programs are more significant than the differences. Therefore, the discussion and the Court's holdings that follow apply to all standardbred programs and to all petitioners involved in these cases unless otherwise indicated. Petitioners bear the burden of proof on all issues. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). It is well settled that the economic substance of a transaction, rather than its form, controls for Federal tax purposes. Gregory v. Helvering, 293 U.S. 465 (1935). The economic realities, rather than the form or labels employed by the parties, control the tax consequences of a transaction. Although a taxpayer is entitled to reduce his taxes by any means that the law allows, "the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended." Gregory v. Helvering, supra at 469. In Frank Lyon Co. v. United States, 435 U.S. 561 (1978), the Supreme Court summarized these principles as follows:
This Court, almost 50 years ago, observed that "taxation is *491 not so much concerned with the refinements of title as it is with actual command over the property taxed -- the actual benefit for which the tax is paid." Corliss v. Bowers, 281 U.S. 376, 378 (1930). In a number of cases, the Court has refused to permit the transfer of formal legal title to shift the incidence of taxation attributable to ownership of property where the transferor continues to retain significant control over the property transferred. E.g., Commissioner v. Sunnen, 333 U.S. 591 (1948); Helvering v. Clifford, 309 U.S. 331 (1940). In applying this doctrine of substance over form, the Court has looked to the objective economic realities of a transaction rather than to the particular form the parties employed. The Court has never regarded "the simple expedient of drawing up papers," Commissioner v. Tower, 327 U.S. 280, 291 (1946), as controlling for tax purposes when the objective economic realities are to the contrary. "In the field of taxation, administrators of the laws, and the courts, are concerned with substance and realities, and formal written documents are not rigidly binding." Helvering v. Lazarus & Co., 308 U.S. [252], at 255 *492 [1939]. See also Commissioner v. P. G. Lake, Inc., 356 U.S. 260, 266-267 (1958); Commissioner v. Court Holding Co., 324 U.S. 331, 334 (1945). Nor is the parties' desire to achieve a particular tax result necessarily relevant. Commissioner v. Duberstein, 363 U.S. 278, 286 (1960). [435 U.S. at 572-573.] The principal issue for decision is whether the various transactions are so lacking in economic substance as to be considered economic shams. [8] A transaction which is devoid of economic substance is not recognized for tax purposes. Frank Lyon Co. v. United States, supra at 573. In deciding whether a transaction has economic substance, great weight is placed on objective facts *493 such as: The fair market value of the property involved, the presence or absence of arm's-length price negotiations, the relationship between sales price and fair market value, the financing structure, whether the benefits and burdens of ownership shifted, and whether the parties adhered to the terms of their contract. Cherin v. Commissioner, 89 T.C. 986 (1987); Rose v. Commissioner, 88 T.C. 386, 410 (1987), affd. 868 F.2d 851 (6th Cir. 1989). The Court first considers the value of the various standardbred programs. Petitioners contend that, in addition to horses, they purchased valuable warranties and purchase options in the Racing & Breeding Program, Breeding Program, and in the Bethel and Keystone programs. These warranties, described earlier in greater detail, consisted of a mortality warranty, a fertility warranty, a yearling purchase option in the breeding program, and a racing warranty. Mr. Rhulen testified that he had seen similar warranties in the registered cattle industry but none of the experts observed the offering of such warranties in horse racing or breeding programs. Each of the expert witnesses believed *494 the Farley program warranty provisions were unique in the standardbred industry. Mr. Rhulen was also of the opinion that the financing terms in the various Farley programs extended well beyond terms that were usual and customary in the standardbred industry. The experts' conclusions as to the value of the warranties ranged from Mr. Rhulen's opinion that they had no value to Mr. Klohr's general assessment that they added substantial value. The Court first considers the value of the warranties and options and then considers the value of the horses independently of the warranties and options. It is incumbent upon petitioners to establish what portion of the purchase price was allocable to the various warranties. Mr. Klohr, petitioners' expert, did not value the warranties and options separately from the value of the horses. His testimony as to the method for valuation of the warranties and options was vague, and his ultimate conclusions about their value were expressed broadly and unspecifically. With respect to the racing warranty, he stated only: "I couldn't put a value, a dollar value, on that because if a horse starts racing, their value increases tremendously. The fact that *495 they were guaranteeing that so many horses would make the races was certainly a tremendous plus to an investor." As to the other warranties, he said: "I think the fertility warranty was something in excess of a million dollars. The mortality warranty was maybe $75,000." His estimate of the value of the yearling purchase option, assuming it would be exercised consistently over a 15-year period, ranged from the guaranteed minimum of $ 100,000 to "four or five million dollars, maybe" if price were calculated under the "five times the stud fee" provision. The Court finds Mr. Klohr's testimony to be too vague to be of any benefit in deciding what value, if any, the warranties and options had in the programs in question. The Court, therefore, disregards Mr. Khohr's opinion on the warranties and options. Petitioners' other expert, Mr. Bradley, was of the opinion that the warranties and purchase options had value. He valued the warranties and options as a percentage of the base value for each horse as follows: Mortality warranty: 4 percent per year Fertility warranty: 6 percent Guaranteed purchase option: 15-20 percent Racing warranty: 15 percent Mr. Bradley based his percentages *496 for the mortality and fertility warranties by comparison with the cost of mortality insurance (4 percent per year). He considered that the protection these warranties offered was analogous to mortality insurance. He reasoned that infertility had the same effect as death of the horse from a breeder's standpoint. He increased the percentage for the fertility warranty from 4 percent to 6 percent "because it is an unusual policy with a little more risk". He valued the yearling purchase option at 15 percent to 20 percent for its guaranteed cash flow and valued the racing warranty at 15 percent due to his assessment that the warranty would give the purchasers "roughly twice as much chance of having horses on the track as the normal standards". Mr. Rhulen, respondent's expert, testified that, in his opinion, the warranties did not add any value to the programs because certain terms of the warranties were ambiguous or inadequately defined. He testified that the warranties were vague, were subject to different interpretations, and would be difficult to enforce. For example, he noted that the racing warranties guaranteed only that horses would "qualify" to race rather than actually race. *497 Moreover, the warranty language did not specify the types of races or racetracks. The warrantor might contend that the racing warranty was met if a horse qualified in races or at racetracks that would yield little or no racing income. He further was of the opinion that the remedies the warranties afforded were inadequate. For example, the replacement of horses with others of "comparable bloodlines" was a term he considered difficult to interpret or enforce within the standardbred industry. He testified that "comparable bloodlines" would not guarantee that a replacement horse would be of equal value to the horse replaced because multiple factors in addition to bloodlines must be considered in determining a standardbred's value, and even full-blood siblings might significantly differ in value. He estimated that, due to group discounts, mortality insurance on the horses would cost approximately 3.5 percent of the value of each group and would provide protection for the investors superior to the mortality warranty of replacement of a dead horse with one of "comparable bloodlines". He also pointed out that the fertility warranties did not add anything because the average fertility *498 rate in the standardbred industry exceeded the percentage which was warranted in the Farley programs. [9]
The Court finds that Mr. Rhulen's analysis of the fertility warranty in the context of the industry fertility average persuasive and agrees with his conclusion that this warranty added no significant value to the programs. The Court also agrees with Mr. Bradley's reasoning that the value of the mortality warranty is analogous to the cost of a mortality insurance policy and accepts Mr. Rhulen's testimony that a mortality policy could have been purchased for the horses, as a group, for 3.5 percent of the fair market value of *499 the horses. The Court, therefore, finds that the value of the mortality warranty in the two programs in which the manager was not required to carry insurance, Bethel and Keystone, equaled 3.5 percent of the fair market value of the horses included in those programs. With respect to the Breeding Program, the management agreement required Arden Hill Farms to maintain "liability and other insurance". Since the terms of that agreement could reasonably be construed to require mortality insurance on the horses, the Court finds that the mortality warranty was merely duplicative of insurance coverage and added no additional value to that program. The Court accepts the opinion of Mr. Rhulen that the racing warranty added no value to the racing programs. As noted, such a warranty was not common in the standardbred industry. It was in general and vague terms and subject to different interpretations, and the remedies afforded for breach of the warranty were questionable. The Court agrees with Mr. Bradley's opinion that the yearling purchase option had value and finds 15 percent of the base value of the horses as the value for this option. In summation, therefore, the Court finds that *500 the fertility warranty had no value; the racing warranty had no value; the mortality warranty had no value in those programs where the management contract required the manager to carry such insurance and, in those programs where insurance was not required, the warranty is valued at 3.5 percent of the base value of the horses involved; and the yearling purchase option had a value of 15 percent of the base value of the horses. The Court next considers the value of the horses independently of the warranties and options. All experts agreed that the value of a standardbred may fluctuate substantially and rapidly with events such as the horse's or its sibling's winning a major race, infertility, lameness, and a variety of other factors increasing or decreasing its value overnight. However, syndication alone does not add value to a horse or a group of horses. In the industry, standardbreds typically are syndicated after some intervening event, such as a successful racing season, making a horse more valuable for breeding. Therefore, the Court attributes no value to petitioners' contentions that the syndication services of Mr. Farley added value to a horse or groups of horses. In valuing *501 the standardbreds, each of the experts considered the bloodlines of the horses, available racing results, and their confirmation or physical characteristics. In appraising the horses, Mr. Rhulen, respondent's expert, assumed that any horse he had not seen personally had average confirmation, which he described as "7.5 to 8 on a scale of 10". Using that criterion, which he stated would value the horses "on the high side", he assigned values calculated to equal the price the horse would have brought at a fair public auction. Mr. Bradley, petitioners' expert, also assumed all horses were of average confirmation and health and had no physical deformities. He testified that he valued the horses "conservatively". He assigned a "base" value to each horse, representing his opinion as to the amount a horse would have brought at public auction on the appraisal date. Mr. Bradley then added a 15-percent markup to the base value of each horse for the seller's profit and to compensate the seller for expenses such as insurance, boarding, veterinary bills, and management expenses. However, in most instances, the horses were sold to petitioners shortly after their acquisition by the Farley *502 companies. As stated earlier, the Court rejects an allowance to a promoter for merely assembling horses and maintaining them briefly for syndication. The 15-percent markup allowed by Mr. Bradley is not accepted. The parties separately arranged for Arden Hill Farms' compensation for management services and other expenses as part of the syndications. Therefore, such services have been adequately accounted for and the Court is not persuaded that such services added value to the horses. Accordingly, the Court disregards Mr. Bradley's additional markup in valuing the standardbreds. The values of the horses determined by Mr. Rhulen and Mr. Bradley (including the percentages added by Mr. Bradley for markup and warranties) are set forth below: Program/Horse
Date
Rhulen
Date
Bradley [1]
Racing &
Breeding
Armbro Waldorf
6/80
$ 14,000 [2]
Armbro Waveway
6/80
15,000 [2]
Armbro Winsome
6/80
41,000 [2]
Precious Love
6/80
27,000 [2]
One Over Prime
6/80
48,000 [2]
Arden's Formal
6/80
14,500 [2]
Countess Dolly
6/80
10,000 [2]
$ 169,500   *503 Program/Horse
Date
Rhulen
Date
Base
Bradley
Racing &
Breeding
Adiosa Travel
12/80
$ 25,000
12/1/80
$ 5,000 + 59% =
$ 7,950
Bye Bye Skipa
12/80
70,000
12/1/80
50,000 + 59% =
79,500
Best of Star
12/80
75,000
12/1/80
25,000 + 59% =
39,750
Getting Ready
12/80
22,500
12/1/80
6,000 + 59% =
9,450
Lady Be Careful
12/80
30,000
12/1/80
10,000 + 59% =
15,900
Posture
12/80
35,000
12/1/80
25,000 + 59% =
39,750
Silent Tribute
12/80
20,000
12/1/80
5,000 + 59% =
7,950
Trotwood Candy
12/80
20,000
12/1/80
20,000 + 59% =
31,800
$ 297,500
$ 146,000
$ 232,050
Bethel
Adiosa Eagle
10/81
$ 8,000
11/1/80
$ 5,000 + 42% =
$ 7,100
Dream Drummer
10/81
12,000
11/1/80
5,000 + 42% =
7,100
Arden's Carie
10/81
9,000
11/1/80
5,000 + 42% =
7,100
Casey G.
10/81
15,000
11/1/80
8,000 + 42% =
11,360
$ 44,000
$ 23,000
$ 32,660
Keystone
Arden's Gandaulf
10/81
$ 12,500
11/1/81
$ 4,000 + 42% =
$ 5,680
Mystical Thunder
10/81
10,000
11/1/81
3,000 + 42% =
4,260
Overmatch
10/81
27,500
11/1/81
15,000 + 42% =
21,300
Ringinthenew
10/81
20,000
11/1/81
20,000 + 42% =
28,400
$ 70,000
$ 42,000
$ 59,640
Meadow Michael
3/79
$ 6,000
1/1/79 $ 3,000 + 15% =
$ 3,450
Sportscaster
1/2/80
[1] 115,000
1/1/80 110,000 + 25% =
137,500
Albatrick
7/83
60,000
10/1/83 100,000 + 25% =
125,000
Majicobb
12/29/78
3,000
12/1/78 2,000 + 15% =
2,300
Frosty Move
12/20/78
4,000
12/1/78 4,200 + 15% =
4,830
Robena Lobell
3/02/79
[1] 37,000
3/1/79 30,000 + 15% =
34,500
Brilliant Wave
7/78
4,000
Bye Bye Skipa [2]
8/15/79
59,000
Hilarious Lori
11/79
13,000
Lady Linda Bret
12/80
30,000
La Esperanza
10/80
25,000
Shane T. Hanover
12/81
350,000
Real Dream
5/30/78
15,000
*504 The seven horses in the Racing and Breeding Program were initially acquired by Mr. Farley or one of the Farley companies from unrelated parties as follows: Horse
Date
Cost
Type of Sale
Armbro Waveway
9/79
$ 8,000
Auction
Armbro Waldorf
9/79
9,500
Auction
Armbro Winsome
9/79
35,000
Auction
Countess Dolly
9/79
8,500
Auction
Precious Love
9/79
21,000
Auction
One Over Prime
9/79
42,000
Auction
Arden's Formal
8/78
[1] 9,200
Auction
Total
$ 133,200
Petitioners' only expert for the Racing and Breeding Program was Mr. Klohr. As noted earlier, the Court *505 disregards his opinion as to the value of the warranties and the yearling purchase option. As to the value of the horses, Mr. Klohr's appraisal is of little value to the Court and is disregarded. Mr. Klohr's appraisal is dated May 14, 1980, and is the appraisal which was provided to investors at the time the program was syndicated. The entire bundle, i.e., the horses, warranties, and option, was valued by Mr. Klohr at $ 1,750,000, without any itemization or allocation among the individual horses and the warranties and option. Acknowledging that the acquisition cost for the horses was $ 155,500 (a figure which differs from what the parties stipulated at trial), Mr. Klohr stated: With all of the above factors contributing to the herd's total potential for appreciation and worth over the proposed duration of the partnership term of 30 years, and depending upon such race results as may be established in the future, the total value of the herd may well exceed $ 1,750,000.00 notwithstanding the herd's initial purchase price of $ 155,500.00. The factors Mr. Klohr referred to are the warranties, the yearling purchase option, the earnings potential of each horse, the lineage of the *506 herd, and a proposed regulation by USTA which would have limited the number of mares a stallion could service each year. This proposed regulation was withdrawn and never placed in effect. The generalizations of Mr. Klohr do not suffice for our purposes here. This Court's mandate is to ascertain the value of the horses on the date the investors entered the program -- not 30 years down the road and not based upon race results which might be established in the future. The Court, therefore, cannot give credence to Mr. Klohr's appraisal. Mr. Rhulen, respondent's expert, documented his report by the valuation methodology he used. The Court accepts his opinion of the value of the horses in the Racing & Breeding Program as of the date petitioners invested in the program. Mr. Rhulen's appraisal, however, is subject to an upward adjustment. As noted earlier, the Court accepts Mr. Bradley's opinion that the yearling purchase option did add value to the Farley programs and, since this option was part of the Racing & Breeding Program, the Court accords an additional 15 percent to the values found by Mr. Rhulen. Therefore, the Racing & Breeding Program is found to have had a value of $ *507 194,925 on the date of petitioners' investments therein, consisting of $ 169,500 as the value of the horses and $ 25,425 as the value of the yearling purchase option. The eight standardbreds included in the Breeding Program were initially acquired by Mr. Farley or one of the Farley companies from unrelated parties as follows: Horse
Date
Cost
Type of Sale
Adiosa Travel
8/78
$ 7,000
Private
Bye Bye Skipa
8/79
59,000
Auction
Best of Star
3/77
12,000
Private
Getting Ready
6/79
25,000
Private
Lady Be Careful
8/79
9,500
Auction
Posture
10/78
32,000
Private
Silent Tribute
10/77
4,000
Private
Trotwood Candy
1978
8,500
Private
Total
$ 157,000
Mr. Klohr's opinion as to the value of the horses in this program is disregarded for the reasons recited earlier. The opinion of Mr. Bradley, petitioners' expert, is that the value of the horses in this program, including all the aforementioned amenities, was $ 232,050. The opinion of Mr. Rhulen, respondent's expert, is that the value of this program was $ 297,500. The Court accepts Mr. Rhulen's appraisal of $ 297,500, for reasons heretofore stated, and adds to that figure an additional 15 percent, or $ *508 44,625, for the yearling purchase option. The total value for this program, therefore, is $ 342,125. The appraisals of Mr. Bradley and Mr. Rhulen were offered as to the value of the Bethel and Keystone programs, the horses of which are identified in the table above. The Court accepts the appraisals of Mr. Rhulen for these programs. Since both programs were racing and not breeding programs, there were no yearling purchase options provided to the investors. However, there were mortality warranties provided and, since the record does not show that the manager was required to carry insurance on the horses, the values of Mr. Rhulen are increased an additional 3.5 percent for such warranty. Accordingly, for Bethel, the Court finds the value of this program to be $ 45,540, consisting of Mr. Rhulen's appraisal of $ 44,000, plus $ 1,540 representing the 3.5 percent value for the mortality warranty. For Keystone, the Court finds the value of that program to be $ 72,450, comprised of Mr. Rhulen's $ 70,000 value, plus 3.5 percent, or $ 2,450, for the mortality warranty. Taking each of the other individual horses, in the order listed in the above table, the Court accepts the values determined *509 by Mr. Rhulen (which in most cases exceeded the values determined by petitioners' expert, Mr. Bradley), as follows: Meadow Michael
$ 6,000
Sportscaster
$ 115,000
Albatrick
$ 60,000
Majicobb
$ 3,000
Frosty Move
$ 4,000
Robena Lobell
$ 37,000
Petitioners presented no opinions as to the values of the other horses listed in the above table, except Shane T. Hanover. The Court accepts Mr. Rhulen's appraisal as to those horses on the dates shown in the table above as follows: Brilliant Wave
$  4,000
Bye Bye Skipa
$ 59,000
Hilarious Lori
$ 13,000
Lady Linda Bret
$ 30,000
La Esperanza
$ 25,000
Real Dream
$ 15,000
Shane T. Hanover was acquired by Mr. Farley as a yearling colt in August 1981 at public auction for $ 350,000. Petitioners relied solely on Mr. Klohr's opinion to support a value of $ 2 million for this horse as of the November 1981 syndication. Respondent's expert, Mr. Rhulen, testified that the fair market value of the yearling did not exceed $ 350,000, the amount paid by Mr. Farley at public auction 3 months prior to the transaction with petitioners, reasoning that no significant intervening events had occurred to increase or decrease the value. *510 The Court agrees with Mr. Rhulen that the fair market value of Shane T. Hanover was $ 350,000 on the date acquired by petitioners. The prices for the horses in all of the programs, including the investment terms, were all set by the seller without effective arm's-length negotiation between the parties. The prices petitioners agreed to pay for the programs greatly exceeded the fair market value of the horses and rights they received. The financing structure was such that the investors paid a relatively small amount of the total purchase price in cash and deferred payment of principal on notes past the time when the horses purchased would be economically useful. The financing arrangements were well beyond customary financing arrangements in the standardbred industry. Petitioners' liability for reimbursing Arden Hill Farms for expenses of maintaining the horses was nonrecourse, and a significant portion of the purchase prices in the partnership and corporation programs was represented by nonrecourse notes of the entities. The terms of the contracts between the parties were not carried out or enforced in many instances, with Arden Hill Farms failing to fully perform duties required *511 to effectively manage the horses, and petitioners failing to make payments required by the notes and purchase agreements and failing to exercise, in particular, the yearling purchase options. Whether the benefits and burdens of ownership transfer from seller to buyer is a question of fact. Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221, 1227 (1981). A normal attribute of a true arm's-length sale is a purchase price approximately equal to fair market value. Grodt & McKay Realty, Inc. v. Commissioner, supra at 1240-1241. The totally disproportionate purchase prices of all transactions in these cases strongly militates against petitioners' contention that true sales took place. Estate of Franklin v. Commissioner, 544 F.2d 1045 (9th Cir. 1976), affg. on different grounds 64 T.C. 752 (1975). This Court has applied the following factors in deciding whether a transaction is to be recognized as transferring ownership for tax purposes: (1) Whether legal title passes; (2) how the parties treat the transaction; (3) whether an equity was acquired in the property; (4) whether the contract creates a *512 present obligation on the seller to execute and deliver a deed and a present obligation on the purchaser to make payments; (5) whether the right of possession is vested in the purchaser; (6) which party bears the risk of loss or damage to the property; and (7) which party receives the profits from the operation and sale of the property. Cherin v. Commissioner, 89 T.C. at 997; Grodt & McKay, Inc. v. Commissioner, supra at 1237-1238. The transactions between the Farley companies and petitioners did not serve to transfer the benefits and burdens of ownership of the various standardbred programs to petitioners or the partnerships or other entities in which they invested. Bethel and Keystone were similarly structured. The offering materials boldly promoted the tax savings to investors as "cash profits". The horses were not identified. Some of the notes the investors executed in favor of the corporations were discounted by Mr. Farley and the proceeds were applied to debts he or his companies owed which were unrelated to the standardbred programs of the investors. In Keystone, the program was oversyndicated, and no adjustments were made *513 to the investors. Some of the horses were pledged by Mr. Farley for other purposes with no accounting provided to the corporations. Petitioners contend that, because Mr. Price, during 1983, purchased the stock of these two corporations along with the stock of the five other subchapter S corporations, and because Mr. Price assumed liability for all the notes petitioners had personally executed for the horses, somehow this acquisition and assumption by Mr. Price established that the corporations owned the horses. The Court disregards the purported sale of the seven corporations to Mr. Price. There was no logic to the transaction. If Mr. Price was indebted to Mr. Farley for the advances Mr. Farley made to the Pines development, any consideration in the 1983 sale of the corporations to be paid by Mr. Price would logically be paid to Mr. Farley. However, the assumption of Mr. Price was assumption of liabilities owing by the stockholders, including petitioners. Mr. Price did not assume any liabilities owing by Mr. Farley, nor did Mr. Price pay any cash to Mr. Farley. The purported transaction had absolutely no meaning. Not only was the transaction not logical, Mr. Price never took *514 possession or control of any of the programs and, approximately 1 year later, all of the programs were taken over by Mr. Metcalfe. No evidence was presented to show how Mr. Price's interests were accounted for, if at all. Whatever purpose the transaction with Mr. Price had, the Court is satisfied that it did not lend any credence to petitioners' contentions that they owned any beneficial interest in the horses in these programs. Perhaps the most convincing evidence that these two programs had no economic substance is the criminal indictment of Mr. Farley, the allegations of which were not refuted at trial, in which Mr. Farley was charged with aiding and abetting in the filing of false income tax returns in connection with various standardbred racing programs, one of which was Keystone. The indictment alleged that documents were backdated; horses were overvalued; some of the programs were oversyndicated; in one corporation, no horses were ever acquired; some horses were replaced without notice to the owners; and financing was illusory in that moneys were either never paid or, if paid, were repaid to the investor by Mr. Farley. The record of this case supports these allegations, *515 not only as to the Bethel and Keystone programs, but other programs as well. Specifically, in one program, Konenkamp Stables, Inc., which involved the horse Meadow Michael, respondent produced evidence at trial which established that Mr. Farley or his companies owned only a 28-percent interest in the horse, yet sold a 40-percent interest to Mr. Konenkamp. Majicobb and Frosty Move were purchased during 1980, respectively, by petitioners Byrne Doyle and Richard Doyle. In that same year, these two horses were syndicated by Mr. Farley as part of the Ohio #1 Program. Petitioners Howard G. and Eloise S. Brown purchased an interest in Albatrick during 1983. In 1984, Mr. Farley sold the horse and claimed at trial that the interests of the owners had been accounted for by an interest in Shane T. Hanover. Yet, Mr. and Mrs. Brown reported, on their 1985 return, a Schedule E loss from their interest in Albatrick. In all the programs, the record does not establish that valid legal title to the horses actually passed to petitioners. As noted, some horses had previously been sold to others without proof that those interests had been reacquired by the seller prior to the sales to petitioners. *516 Further, the documents did not clearly place legal title to the horses in the selling Farley company. However, even if the sellers intended to convey title to the horses, and petitioners obtained legal title to the standardbreds, petitioners, nevertheless, allowed Arden Hill Farms to represent itself, rather than petitioners, as record owner of the horses to the USTA, State racing commissions, service providers (such as veterinarians and boarding facilities), other standardbred breeders, including stallion owners to who mares involved in petitioners' programs were bred, and lenders to whom horses were pledged to secure debts of the Farley companies. In practice, Arden Hill Farms treated the horses as its own in most respects, including purportedly transferring title to horses to other parties while petitioners believed they still owned them. Such transfers were facilitated by the fact that, in all but the Shane T. Hanover Associates program, petitioners allowed Arden Hill Farms to maintain USTA registration of the horses in its name without making petitioners' ownership interests known to third parties. Petitioners' argument that USTA registration of the horses was maintained *517 in the name of Arden Hill Farms for the convenience of, and in the best interests of, the investors is not persuasive. Petitioners first contend that such registration facilitated filing of routine paperwork with the USTA and avoided the inconvenience of obtaining multiple signatures of all the owners. However, the evidence shows that USTA rules allowed multiple owners of horses to designate a single corresponding agent to avoid the problems and inconveniences petitioners complained of. Such a method was utilized in the Shane T. Hanover Associates program but was not employed in any of the other individual horse or partnership or corporate programs at issue. Petitioners also argued that maintaining USTA registration in the name of Arden Hill Farms was necessary because registration in accordance with USTA rules (which would have made the identities of all individuals with an ownership interest in the horses a matter of record) might render an entire program ineligible for racing if a single member of a program ran afoul of the rules of a State racing commission for some reason, such as conviction of a crime. If that was a concern, provision for such contingencies could have easily *518 been specified in the agreements between the investors and Mr. Farley. The Court is not convinced that concealing true ownership of the horses in violation of the rules of the USTA represented a necessary or prudent business practice. Furthermore, the rationale espoused by petitioners should logically have extended to the multiple-partner Shane T. Hanover Associates program -- which clearly anticipated racing the horse -- but that partnership was properly registered with the USTA in the name of the partnership, with the individual partners identifed in the application. By failing to register the horses in a manner that properly reflected their ownership interests, petitioners limited their ability to safeguard their rights in the horses. There was very little chance that petitioners would ever acquire any equity in the programs for several reasons: (1) The purchase prices for the horses were grossly in excess of fair market value; (2) only relatively small portions of the purchase prices were paid in cash; (3) for several years, all principal payments on the notes were to be made out of earnings, yet there was little chance that any earnings would ever be applied to the notes *519 because of maintenance and training expenses payable to the promoter; and (4) when payments were in fact due after several years, the investors' obligations became nonrecourse. Petitioners allowed Arden Hill Farms to retain possession and control over the horses at all times. In the programs where written management agreements were executed, petitioners theoretically had the right to possess the horses by terminating the management contracts but payment of all "shortfall advances" was a prerequisite for cancellation of the contracts. Additionally, petitioners testified they did not take steps to take control of the horses after it became evident that the programs were not being operated as anticipated because they believed their defaults on the notes to the Farley companies would be raised as a defense to any action against the promoter. Thus, the financial structure of the programs and the terms of the management agreements effectively made possession of the standardbreds by petitioners difficult, if not impossible, without payment of sizeable advances charged to petitioners by Arden Hill Farms and/or amounts due on the acquisition notes. Under the warranties, the Farley companies *520 assumed most of the risks with respect to the horses. Petitioners' risks in this regard were only that the Farley companies might not make good on the promises to assume those risks. This is not the risk normally associated with ownership for tax purposes. A final consideration is the allocations of profits from racing or sales of the horses or their progeny. Here, proceeds went to the Farley companies until substantial management and training fees, "shortfall advances", and accrued interest on promissory notes were paid. Because petitioners' acquisition debts greatly exceeded the actual value of the horses, petitioners could only realize a profit if the racing programs were phenomenally successful, or the value of the horses or herds greatly increased in the future. This allocation of speculative future profits is inadequate to support a sale for Federal tax purposes. The mere presence of a subjective profit objective will not require recognition of a transaction for tax purposes which lacks economic substance. Cherin v. Commissioner, 89 T.C. at 993. All petitioners testified that they sought profits which might arise from successful horse racing and/or *521 breeding operations, and they relied entirely upon Mr. Farley to carry on the ventures. Despite this testimony, the Court does not believe petitioners reasonably had the objective to realize economic gain from their standardbred activities. Many of the same factors that demonstrate lack of economic substance also are important in considering whether petitioners had an "actual and honest profit objective" in engaging in the transactions at issue. Rose v. Commissioner, 88 T.C. at 411; Jasionowski v. Commissioner, 66 T.C. 312, 321 (1976). Petitioners and the general partners of the partnership programs generally had little or no experience with standardbred horse racing or breeding. Petitioners demonstrated no significant efforts to research the feasibility of entering the standardbred business through the Farley horse programs. They invested in the programs with little, if any, investigation of the profit potential of the horses and relied primarily on the representations of Mr. Farley, the promoter of the programs. Petitioners failed to negotiate purchase prices or terms of any of the agreements. The notes they executed to purchase interests *522 in the programs greatly exceeded the value of the property and rights acquired. Petitioners neither sought nor received independent valuations of the horses, although the value of the horses was a key factor in determining whether or not the programs would be successful. The Court is particularly struck at the failure of petitioners, as potential investors, in questioning obvious flaws or contradictions in the offering materials in some of the programs. For example, in the breeding program, the private placement memorandum provided that 10 mares would make up the program. The price for 10 mares was set at $2,750,000. The investors committed themselves in the amount of $2,750,000 for 10 mares. Since fewer than 35 units subscribed to the program, the terms of the syndication provided that a lesser number of horses would be contributed to the program based upon a formula. If a fraction resulted, the next whole number would determine the number of horses in the program. The investors obligated themselves for an additional $550,000 pursuant to this formula. The program, accordingly, was made up of eight horses. However, petitioners remained committed to the original price of *523 $ 2,750,000 for 10 horses, plus $550,000. No questions appear to have ever been raised over this huge error. The offering materials, as explained supra note 7, were contradictory as to how the cash payments of the investors for 3 years were to be applied. In one part of the offering memorandum, the payments were to be applied to interest. In another part of the memorandum, the payments were to be applied to the purchase price of the horses. These differences are significant because, if the payments were applied to interest, the amounts paid would be tax deductible; whereas, if the payments were applied to the purchase price of the horses, there would be no deductions. In the Bethel and Keystone programs, the horses which were to make up the programs were not identified; yet, the four horses in each program were sold to the investors for $400,000. Surely, a prudent investor, for such prices, would or should have inquired as to the identity of the horses. One of the horses in the Bethel program was Dream Drummer, a horse which Mr. Farley had previously purchased from petitioners Howard G. and Eloise S. Brown for $1,044. That same horse was allocated a cost price of $91,667 *524 out of the $ 400,000 cost for the four horses in the Bethel program. No evidence was presented to establish a cause, in any, for the meteoric increase in the value of this horse from $1,044 to $91,667. Yet, Mr. and Mrs. Brown invested in the Bethel program, thus, in effect requiring, for $91,667, a horse they had previously sold for $1,044. For these petitioners to contend that such an investment represented an "actual and honest profit objective" borders on the absured. Perhaps the most glaring and obvious flaw in the offering materials in these cases involved the horse Shane T. Hanover. In that program, the offering materials clearly represented that a 35-percent interest in the horse would be sold to the investors for $700,000, and an additional 35-percent interest would be sold to the partnership for $ 700,000. However, the required investment amount for the investors set out in the offering materials was $1,450,000 -- an amount which clearly was meant to include both 35-percent interests. No questions were ever raised by the investors as to why their 35-percent interest required an investment of $ 1,450,000, when a 35-percent interest in the horse was to be sold to them *525 for $700,000. At trial, petitioners persisted that the partnership had in fact executed a $700,000 note for its 35-percent interest. No note was produced, and the Court finds that no note was ever executed nor was it ever intended that such a note would be executed. Yet, if petitioners' contentions are accepted, which they are not, the selling price for a 70-percent interest in the horse would have been $2,150,000 (their $1,450,000 commitment plus $700,000 by the partnership). This translates to an equivalent price of more than $3 million for the horse. All of these flaws represented substantial amounts of money. Even the most unsophisticated and unenlightened of investors should have detected these contradictions and raised questions as to their meaning. Yet, no questions were raised, fortifying this Court's finding that these programs had no substance, and the potential liabilities of investors, if any existed, were of absolutely no concern to them. After entering into the programs, petitioners' conduct does not support their contention that they engaged in the activities with a profit objective. While investors may leave the conduct of business to others, any prudent investor *526 requires periodic accountings from his manager. Petitioners did not seek to compel the Farley companies to account for proceeds of the activities they managed or meet their obligations under the agreements. Petitioners did not elect to require the Farley companies to purchase yearlings in those programs where the purchase option was applicable. Petitioners did not seek to enforce the racing warranty in the programs where they had been provided this warranty. Several of the horses were lost to creditors for unpaid boarding, stud, or other fees while petitioners were relying on Arden Hill Farms to manage the horses and pay expenses. Additionally, at trial, petitioners appeared generally uninformed about the operation of the standardbred programs in which they had invested and entrusted Mr. Farley to manage. They were unsure about which horses had raced and how successful they had been; they were not clear about the results of breeding operations; and they were ignorant of the ultimate disposition of many of the horses and/or their progeny. While some lack of detail can be reasonably attributed to faded memories of events that occurred some years previously, the nature of petitioners' *527 testimony leads the Court to the conclusion that they had never known much of the pertinent information about the standardbred programs,and really did not care to know that much about the programs. In this connection, the testimony at trial established that funds held by Mr. Farley for various programs were indiscriminately used by Mr. Farley to pay debts he owed, which were unrelated to the standardbred programs, and for his personal benefit. Toward the end, when the entire operation was destined for collapse, Mr. Metcalfe came in, purportedly buying everything, including horses owned by petitioners, and sold them as needed to fund operations. That also proved to be unsuccessful but, for purposes of this case, the interests of petitioners were totally disregarded. The most telling factor is the vastly inflated purchase prices charged for petitioners' interests in the standardbreds. The Ninth Circuit has stated that such an inflated purchase price is "Perhaps the most important single factor suggesting that the actual motive for the * * * activities was tax avoidance rather than even speculative profit". Independent Electric Supply, Inc. v. Commissioner, 781 F.2d 724, 728 (9th Cir. 1986), *528 affg. Lahr v. Commissioner, T.C. Memo. 1984-472. On this record, the Court concludes that the transactions lacked economic substance, and, accordingly, the transactions have no effect for tax purposes. It is apparent that the programs were promoted by Mr. Farley and entered into by petitioners for the tax benefits involved, without regard to the fair market value of the horses and without significant inquiry into what was being acquired and what income might be produced by the racing or breeding operations, nor was there any concern about liability for payment of the obligations purportedly contracted for the investments. Petitioners freely admit that tax considerations played a major part in their decisions to enter into the standardbred programs. The information sought and received from Mr. Farley focused on the tax advantages to be obtained. With the exception of Mr. Kims, Mr. Farley was petitioners' tax adviser and paid preparer of the Federal income tax returns wherein petitioners claimed the tax deductions at issue and, as such, advised petitioners to invest in the standardbred programs to reduce their income tax burdens. Overall, petitioners appeared *529 indifferent to the economic success or failure of the ventures and appeared to be contented with their recovery of tax refunds, which exceeded the cash investments they made in the standardbred programs. On this record, the Court concludes that petitioners engaged in the transactions to obtain tax deductions and thereby reduce the taxes they would otherwise have been required to pay on their substantial income from other sources. See Beck v. Commissioner, 85 T.C. 557, 570-571 (1985); sec. 1.183-2(b)(8), Income Tax Regs.
Since the transactions lacked economic substance, the claimed depreciation and expenses are not deductible. It is, therefore, not necessary to address the alternative issues raised by respondent other than those involving petitioners' interest deductions and additions to tax and increased interest. The question of deductibility of interest turns on the character of the underlying indebtedness -- essentially, whether the debt is bona fide. All petitioners testified that, when they invested in the programs, they anticipated that the long-term notes they signed, which were recourse on face, would be paid in full. However, few, if any, principal *530 payments were made by petitioners on the notes, and eventually petitioners either were relieved of liability on the obligations through Farley-arranged assumptions of the debts or defaulted on the notes. Further, in the case of the racing and breeding program and the breeding program, by the terms of those programs, the recourse notes would become nonrecourse before final payment was due if the group of horses grew to a certain size as would normally be expected in the industry. The Court examines the substance of the debt and is not guided solely by its form. Deferred debt that, in fact or in substance, is unlikely to be paid lacks economic substance. Waddell v. Commissioner, 86 T.C. 848, 902 (1986), affd. 841 F.2d 264 (9th Cir. 1988); Estate of Baron v. Commissioner, 83 T.C. 542 (1984), affd. 798 F.2d 65 (2d Cir. 1986). Here, due to the financing structure and the inflated purchase prices, the long-term notes represented amounts far in excess of the fair market values of the property for which they were given. Although denominated as "recourse" notes, the notes were so commercially unreasonable that the *531 Court does not believe that they were ever intended to be repaid. See Waddell v. Commissioner, supra.The Court, therefore, holds that petitioners' notes, while recourse in form, did not represent bona fide indebtedness sufficient to support interest deductions. In some instances, where short-term notes appear to have been paid with interest, the evidence reflects rebating of substantially corresponding amounts to petitioners by Mr. Farley. An example of this is found with the Browns' $ 5,000 note for Bethel which was discounted to Citizen's Bank and paid by the Browns together with $ 778.33 in interest in June 1982. The same month, the Browns received $ 5,778 from Mr. Farley, purportedly for buy-back of interests in two horses sold to the Browns by Mr. Farley in prior years. Similarly, there was a buy-back of Konenkamp Stables stock by Arden Hill Farms by means of a promissory note with payments which equaled the amounts of principal and interest due under Konenkamp's acquisition note for the stock. On this record, the Court holds that petitioners have not established their entitlement to interest deductions on the short-term obligations. Respondent, *532 therefore, is sustained in the disallowance of the losses and deductions claimed by petitioners in all these cases. As a result of this Court's findings, certain adjustments in these cases must be resolved in favor of petitioners. On their 1982 return, petitioners Howard G. and Eloise S. Brown reported their Bethel activity on Schedule E, Small Business Corporations, and reported a $ 20,800 loss from that activity. In the notice of deficiency, respondent disallowed $ 22,416 with respect to petitioners' Bethel activity for 1982, consisting of $ 10,800 depreciation and $ 11,616 expenses. This adjustment by respondent clearly exceeds the loss claimed by petitioners by the amount of $ 1,616. As to this item, respondent's adjustment is limited to $ 20,800 rather than $ 22,416 as set out in the notice of deficiency. On their 1983 return, petitioners Howard G. and Eloise S. Brown reported on Schedule D of their return, Capital Gains and Losses, a long-term capital gain of $ 39,230 from the sale of their stock in Bethel to Mr. Price. In the notice of deficiency, respondent determined that petitioners understated their basis for this stock in the amount of $ 10,000 and, accordingly, *533 determined the gain as $ 49,230. Respondent also determined that the gain was ordinary income and adjusted petitioners' 1983 income in the amount of $ 15,692 by eliminating the long-term capital gain deduction claimed by petitioners. Since this Court finds that the transactions lacked economic substance, and since the Court finds that there was in fact no sale to Mr. Price, petitioners are allowed an appropriate adjustment removing the income they reported from this transaction and disallowing the determinations by respondent with respect thereto in the notice of deficiency. Respondent made no income adjustments to the 1986 income tax return of petitioners Howard G. and Eloise S. Brown. However, petitioners calculated their 1986 tax liability under the income averaging provisions of sections 1301-1305. Because of adjustments to petitioners' income for the base period years, respondent determined that petitioners could not use income averaging in calculating their 1986 tax liability. Since 1983 is one of the base years under section 1302(c)(3) with respect to the 1986 tax year, and since one of respondent's adjustments to the 1983 tax return has been redetermined in favor of *534 petitioners, a Rule 155 computation will be necessary to determine whether petitioners may be eligible for income averaging with respect to their 1986 tax year. On their 1980 income tax return, petitioners Richard E. and Nancy B. Doyle reported on Form 4797 of their return, Supplemental Schedule of Gains and Losses, an ordinary gain of $ 7,500 from the sale of a share in a broodmare acquired in 1979 at a cost of $ 15,000, and on which depreciation of $ 7,500 had been allowed in previous years. This same horse is identified on the depreciation schedule of Schedule C of petitioners' 1980 return as one of the horses in petitioners' horse racing activity, the losses of which were disallowed in the notice of deficiency. Respondent made no adjustment in the notice of deficiency with respect to the $ 7,500 ordinary income reported by petitioners. Since the transactions lacked economic substance, and petitioners did not enjoy the benefits and burdens of ownership of this horse, this income item should be removed from petitioners' 1980 income. On their 1982 return, these petitioners reported ordinary income of $ 14,750 on Form 4797 of their return from the sale of two horses. Although *535 these horses were not identified by name on petitioners' return, respondent determined that the two horses were Sportscaster and Bye Bye Skipa. Respondent made no adjustment with respect to this income in the notice of deficiency. This item, therefore, should be removed from petitioners' 1982 income. On Schedule C of their 1980 income tax return, petitioners Thomas C. Konenkamp, Jr., and Frances D. Konenkamp reported gross income of $ 3,175 from their Farley horse activity and claimed $ 16,717 expenses. In the notice of deficiency, respondent disallowed the $ 16,717 expenses but made no adjustment to the $ 3,175 reported income. This income item should be removed from petitioners' income for 1980. On Form 6252 of their 1981 return, Computation of Installment Sale Income, the Konenkamps reported the installment sale of their stock in Konenkamp Stables, Inc., for the selling price of $ 78,900. They reported a zero basis for their stock and, accordingly, reported a gross profit of $ 78,900. On part II of Form 6252, petitioners reported payments of $ 21,800 received during 1981. This amount was reported on Schedule D of their 1981 return as long-term capital gain. On their 1982 *536 return, the Konenkamps reported receipt of $ 15,400 in installment sale payments from the sale of their stock in Konenkamp Stables, Inc., which was also reported as long-term capital gain. Similarly, on their 1983 return, the Konenkamps reported a long-term capital gain installment of $ 14,600 from Konenkamp Stables, Inc. In the notices of deficiency, respondent made no adjustment to these income items on petitioners' 1981 and 1982 returns. The income, therefore, as reported by petitioners with respect to this item, should be removed from income. As to the 1983 return, respondent determined that the $ 14,600 reported by petitioners constituted ordinary income and disallowed the $ 5,840 long-term capital gain deduction claimed by them. Petitioners, therefore, are entitled to an appropriate adjustment to delete this income from their return as well as respondent's adjustment thereto. On Schedule C of their 1983 return, petitioners reported $ 500 gross income from their Farley horse activity, claimed no expenses, and reported a net profit of $ 500. This income item is not addressed in the notice of deficiency. It also should be removed from petitioners' 1983 income. Petitioners *537 also claimed Lady Linda Bret as one of their Farley horse investments. On their 1983 return, petitioners filed a Form 4864, Casualties and Thefts, in which they reported receipt of $ 3,500 during 1983 for the loss of Lady Linda Bret. This income item is not addressed in the notice of deficiency. It should be removed from petitioners' income for 1983. Petitioners S. Byrne and Barbara S. Doyle also reported $ 3,500 from the loss of Lady Linda Bret during 1983. However, the Doyles' 1983 tax year is not before the Court in these proceedings. The remaining issues are the additions to tax and increased interest determined by respondent and set forth as to each petitioner in the findings of fact. The Court's conclusions and holding for each addition to tax and the increased interest are applicable to all petitioners against whom they have been determined by respondent. Respondent determined that petitioners Tripi and Kims were subject to the additions to tax provided by sections 6653(a) and 6653(a)(1) and (2) for taxable years 1980 and 1981. Sections 6653(a) and 6653(a)(1) provide for an addition to tax equal to 5 percent of the underpayment if any part of an underpayment is due *538 to negligence or intentional disregard of rules and regulations. Section 6653(a)(2) provides an addition to tax equal to 50 percent of the interest on the portion of the underpayment attributable to such negligence or intentional disregard. Negligence is the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). These petitioners participated, respectively, in two of the Farley programs, the racing and breeding program, and the breeding program. Both programs were shams and had no economic substance. Petitioners purportedly obligated themselves in amounts which greatly exceeded the value of the horses they purportedly acquired and knew or should have known they would never be called on to pay the debts. Petitioners knew the standardbred programs were not being operated efficiently or prudently and showed no concern that a prudent investor would have shown. Rather, petitioners were motivated by purported tax savings and, being satisfied with that, had little regard for the economics of their investments. Such conduct establishes negligence or intentional *539 disregard of rules and regulations under sections 6653(a) and 6653(a)(1) and (2). Respondent, therefore, is sustained on this addition to tax as to these petitioners. Respondent also determined additions to tax under section 6659 against all petitioners. Section 6659 imposes a graduated addition to tax whenever a taxpayer has an underpayment of tax which equals or exceeds $ 1,000, and the underpayment is attributable to a valuation overstatement. A valuation overstatement occurs when "the value of any property, or the adjusted basis of any property, claimed on any return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be)." Sec. 6659(c). In these cases, the deductions claimed by petitioners were disallowed because the various transactions were shams and lacked economic substance. The properties were overvalued. Where there is a lack of economic substance, for purposes of section 6659, the correct basis is zero, and any basis claimed in excess of that is a valuation overstatement. Gilman v. Commissioner, 933 F.2d 143 (2d Cir. 1991), affg. T.C. Memo. 1990-205; Ryback v. Commissioner, 91 T.C. 524, 566-567 (1988). *540 Petitioners claimed deductions on bases of properties which far exceeded the values found by the Court. The addition to tax under section 6659, therefore, is sustained against all petitioners. Section 6661(a) imposes an addition to tax if there is a substantial understatement of income tax in any given year, where the understatement exceeds the greater of $ 5,000 or 10 percent of the amount of tax required to be shown on the return. Any portion of the understatement that is also subject to the addition to tax under section 6659 for a valuation overstatement is not taken into account in determining the substantial understatement of tax for purposes of section 6661. Sec. 6661(b)(3). [10] In calculating understatements under section 6661(a), items for which there is substantial authority or respect to which all relevant facts were adequately disclosed in or attached to the tax return are not to be considered. Sec. 6661(b)(2)(B). However, in the case of a "tax shelter", even full disclosure in the tax return does not reduce this addition to tax. Sec. 6661(b)(2)(C)(i). For this purpose, section 6661(b)(2)(C)(ii) defines a tax shelter as any partnership or other entity or investment *541 plan or arrangement or any other plan or arrangement the principal purpose of which is the avoidance or evasion of Federal income tax. The understatements in tax here, for the years in which respondent determined this addition to tax, are substantial. The transactions at issue were obvious tax-shelter sham transactions, lacking in economic substance, and the only purpose for the transactions was to reduce petitioners' income tax liabilities. The addition to tax under section 6661(a) is sustained. LaVerne v. Commissioner, 94 T.C. 637, 653 (1990), affd. by unpublished order (10th Cir., Dec. 4, 1991), affd. without published opinion 956 F.2d 274 (9th Cir. 1992). However, certain adjustments *542 have been made in favor of petitioners which will reduce the understatement in tax. Similarly, the understatement in tax will be reduced to the extent any portion thereof is subject to the section 6659 addition to tax. Accordingly, the section 6661(a) addition to tax will not be taken into account as a result of these adjustments. Finally, respondent determined that the increased rate of interest under section 6621(c), formerly section 6621(d), for substantial underpayments attributable to tax-motivated transactions applies to petitioners' standardbred activities. Tax motivated-transactions under section 6621(c) include valuation overstatements within the meaning of section 6659(c) and any sham or fraudulent transaction. Sec. 6621(c)(3)(A)(i), (v). This Court has interpreted "any sham or fraudulent transaction" to include transactions that lack economic substance. McCrary v. Commissioner, 92 T.C. 827, 857 (1989). Accordingly, respondent's determination is sustained on the increased interest. As noted earlier in this opinion, these cases were heard only with respect to those issues which the parties identified as "Farley Horses" issues. The Court's findings, *543 therefore, as reflected in this opinion, may or may not dispose of all issues in these cases. To reflect the foregoing, Appropriate orders will be issued in each case. Footnotes
1. Cases of the following petitioners are consolidated herewith: Thomas C. Konenkamp and Frances D. Konenkamp, docket No. 28010-86; Donald J. Tripi and Bonnie M. Tripi, docket No. 6134-87; Richard E. Doyle and Nancy B. Doyle, docket No. 6518-87; Ronald J. Kims and Lillian T. Kims, docket No. 6586-87; S. Byrne Doyle and Barbara S. Doyle, docket No. 7680-87; Richard E. Doyle and Nancy B. Doyle, docket No. 9855-88; Thomas C. Konenkamp, Jr., and Frances D. Konenkamp, docket No. 9856-88; Howard G. Brown and Eloise S. Brown, docket No. 22027-88.↩
2. All section references are to the Internal Revenue Code in effect for the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. Respondent also determined in the deficiency notices that increased interest is due under sec. 6621(d) in all docket numbers except docket No. 22027-88. Sec. 6621(d) was redesignated as sec. 6621(c) by sec. 1511(c)(1)(A) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2744. For taxable years after 1982, respondent determined increased interest under sec. 6621(c).↩
1. For the 1980 tax years, this addition to tax is under sec. 6653(a); for all other years, the addition to tax is under sec. 6653(a)(1) and (2), where indicated. ↩
2. 50 percent of the interest due on $ 5,182 pursuant to sec. 6653(a)(2). ↩
3. 50 percent of the interest due on $ 16,882.52 pursuant to sec. 6653(a)(2).↩
4. Since the issues are whether petitioners "purchased" horses, and whether the transactions purporting to be a "sale" actually transferred the benefits and burdens of ownership, the Court, throughout this opinion, uses, as the parties have done on brief, terms such as "sale", "sold", "owned", "ownership", "purchase", "acquire", "investor", and other similar terms. Use of such terms is purely for convenience and does not constitute any finding or legal conclusion as to the transactions described.↩
5. The record does not indicate the location of the Brandywine track.↩
6. This factual finding is based upon this petitioner's testimony. The Court assumes that his reference is to Purdue University at West Lafayette, Indiana.↩
1. There were three methods by which the $ 40,000 cash was to be paid over the 5 years. The payment schedule shown here was method A described in the private placement memorandum. Under either of the methods, the total amounts paid to the partnership and Meadowlands Marketing were the same. Eleven units were to be sold under method A, 13 units under method B, and 11 units under method C.↩
7. There is a contradiction in the private placement memorandum as to the cash payments to Meadowlands Marketing. The schedule above is taken from page 2 of the private placement memorandum under the heading, Terms of The Offering and Method of Sale. Under this schedule, $ 35,000 cash was to be paid to Meadowlands Marketing, out of the initial payments of the investors, to apply on the $ 2,750,000 purchase price of the horses. The remaining cash to Meadowlands Marketing, as shown above, constituted interest on the investors' notes. However, at page 27 of the private placement memorandum under the general heading, Acquisition of the Herd, it is stated that the following cash payments applied toward the purchase price of the horses: $ 35,000 in 1980, and $ 30,000 in each of the 1981, 1982, and 1983 payments, thus totaling $ 125,000. The $ 30,000 amounts for 1981, 1982, and 1983 are in conflict with the terms of the offering described on page 2 of the memorandum as shown above. As shown above, the cash payments to Meadowlands Marketing in 1981, 1982, 1983, and 1984 were applicable to interest on the $ 75,000 notes.↩
8. Transactions which are fictitious or a mere paper chase are also considered shams. Falsetti v. Commissioner, 85 T.C. 332↩ (1985). However, these cases do not deal with phantom horses or other indices of fictitiousness.
9. Mr. Rhulen expressed dismay over the repeated references in the investment offering materials to horses as "herds", lending support to Mr. Rhulen's opinion that the warranties offered were taken by Mr. Farley directly from cattle investment programs and that the peculiarities and characteristics of cattle programs do not necessarily equate with those of horse racing and breeding programs.↩
1. Although Mr. Bradley made an appraisal of the horses in the Racing and Breeding Program, petitioners, at trial, elected not to submit his opinion on the value of the horses in this program. ↩
2. Includes $ 6,000 based upon Mr. Rhulen's testimony that $ 5,000-$ 7,000 should be allowed for race training expenses paid by the seller prior to the sale.↩
1. Includes $ 5,000 for race training expenses paid by the seller. ↩
2. Prior to inclusion in the Breeding Program, Bye Bye Skipa was syndicated by Farley to investors including petitioner Richard Doyle. The Rhulen value as of 8/15/79 reflects the auction price paid on Farley's initial acquisition of the horse. The increased value assigned by Mr. Rhulen to Bye Bye Skipa as of 12/80 for the Breeding Program may be attributable to the fact that the horse was in foal with her second Bret Hanover foal in December 1980.↩
1. The purchase price for Arden's Formal included purchase of his dam, Cosmos Girl.↩
10. Respondent determined the sec. 6661 addition to tax against petitioners Brown and Konenkamp for their 1982 and 1983 tax years, and against petitioners Richard Doyle, Byrne Doyle, and Ronald J. Kims for their 1982 tax years. The addition was not determined against petitioner Donald J. Tripi.↩